Pennsylvania Human Relations Commission,
Appellant, *v.* Chester School District.

Argued June 15, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*Nathan Agran,* General Counsel, with him *Herman Speerman,* Assistant Counsel, and *Arthur C. Thomas,* Deputy Attorney General, for Human Relations Commission, appellant.

*Guy G. deFuria,* with him *deFuria, Larkin and deFuria,* for Chester School District, appellee.

*Garland D. Cherry,* with him *Kassab, Cherry, Curran and Archibald,* for amicus curiae.

OPINION PER CURIAM, November 17, 1966:

The order of the Court of Common Pleas of Dauphin County is affirmed on the opinion of Judge JAMES S. BOWMAN for the court below, reported at 40 Pa. D. & C. 2d 493.

---

DISSENTING OPINION BY HOFFMAN, J.:

I respectfully dissent.

This case raises important questions regarding the power of the Pennsylvania Human Relations Commission to remedy racial imbalance in the public schools. The opinion of the lower court, which the majority affirms today, narrowly construes the Commission's statutory mandate and, in my view, improperly curtails the commission's authority in this critical area.

In the fall of 1963, civil rights groups and residents of the City of Chester began a series of increasingly bitter public demonstrations. They charged that the School Board engaged in discriminatory practices in managing the City's educational system. All efforts to resolve the dispute through conciliation met with failure.

At the direction of the Governor, the Pennsylvania Human Relations Commission entered the controversy in May of 1964. The Commission filed a formal complaint under §5(i)(1) of the Pennsylvania Human Relations Act of October 27, 1955, P. L. 744, as amended, 43 P.S. §955(i)(1). That section provides: "It shall be an unlawful discriminatory practice. . . . (i) For any person being the . . . manager, superintendent, agent or employe of any place of public accommodation . . . to (1) Refuse, withhold from, or deny to any person because of his race, color, religious creed, ancestry or national origin, either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such place of public accommodation. . . ." Public schools ("kindergartens, primary and secondary

schools, high schools") are places of public accommodation within the meaning of the Act. §4(1), 43 P.S. §954(1). The term "discriminate" includes "segregate." §4(g), 43 P.S. §954(g).

In its complaint the Commission charged, inter alia, that the Chester School District had failed to adopt and make public an affirmative plan to desegregate the schools; that it had "maintained and gerrymandered" boundary lines in order to perpetuate all-Negro schools within the City; and that the City's all-Negro schools were inferior in physical plant and educational standards to schools which were substantially all-white.[1] Eight days of public hearings produced a voluminous record of testimony and exhibits.

On November 24, 1964, the Commission issued its adjudication and order. The key paragraph of this order directed: "That the respondent, Chester School District, by and through the Chester School Board, its officers, agents and employes, shall take immediate steps to desegregate effectively the all-Negro or substantially all-Negro Douglass Junior High School, and the following all-Negro or substantially all-Negro elementary schools: Dewey-Mann, Franklin, Lincoln, Washington and Watts." The order further required the school district to formulate a plan for the effective desegregation of those facilities, and suggested guidelines for "short range and immediate action."[2]

The schools named in the order are located in the center of Chester, in a predominantly Negro residential

---

[1] The remaining allegations related to the School Board's assignment of Negro teachers and clerical personnel to all-Negro schools; its failure to appoint qualified Negroes to supervisory and administrative positions; and its approval of textbooks which inadequately treated the contributions of the Negro in American life.

[2] Other provisions of the order required the School District to cease and desist from assigning teachers and clerical personnel on a racial basis.

area. At the time of the hearings, there were 10,842 pupils in the Chester School District. Of these, 4,147, or 38%, were white and 6,695, or 62% were Negro. The racial composition of the schools in question was:

|  | White | Negro | Total |
|---|---|---|---|
| Douglass | 1 | 527 | 528 |
| Dewey-Mann | 0 | 823 | 823 |
| Franklin | 10 | 1018 | 1028 |
| Lincoln | 69 | 490 | 559 |
| Washington | 0 | 782 | 782 |
| Watts | 0 | 344 | 344 |
| TOTAL | 80 | 3984 | 4064 |

The Chester School District sought review of the Commission's decision in the Court of Common Pleas of Dauphin County. That court sustained the Commission in part, but set aside those portions of its order relating to racial imbalance, for the following two reasons:

1. The Commission failed to show by substantial evidence that "intentional" or willful discriminatory practices had produced the admitted segregation in the City's schools.

2. The Commission lacked jurisdiction to enter a remedial order directed at mere "de facto segregation." [The court defined that term as ". . . a condition which exists not from any formal legal classification based on race or color—which would be violative of constitutionally protected rights—but rather arises from the effect of residential segregation upon patterns of neighborhood school attendance districts."]

From this determination, the Human Relations Commission appeals.

The court's holding rests on the assumption that the statutory words "Refuse, withhold from, or deny . . . directly or indirectly" contemplate intentional, affirmative acts whose sole purpose is to segregate the

races. Absent such a showing, the court held, the Commission is powerless to remedy the admitted racial imbalance in the Chester schools. I cannot agree.

The Human Relations Act represents a legislative recognition of the standards and conclusions enunciated by the U. S. Supreme Court in *Brown v. Board of Education of Topeka,* 347 U. S. 483 (1954). It assumes that separate educational facilities are inherently unequal; that segregation in our schools must, of necessity, generate a sense of racial inferiority and infect the motivation of the Negro child.

With this background in mind, it is clear that the Human Relations Commission should not be bound by the strict standards imposed upon it by the lower court. Indeed, the Act specifically directs that it be construed "liberally" for the effectuation of its purposes. §12(a), 43 P.S. §962(a). The record before us amply demonstrates the need for such a liberal construction. The Commission found, based on much testimony, that Chester's imbalanced schools have dulled the motivation and depressed the achievement level of the City's Negro pupils.

Moreover, local authorities in Chester have persistently and knowingly failed to correct or attempt to correct the severe racial imbalance in the schools. Mrs. Francis P. Donahoo, President of the Chester School Board, testified as follows:

"Q. How long have you been aware that this condition existed of five schools that are from ninety to one hundred per cent Negro and two schools that are from sixty to ninety per cent Negro?

"A. Mr. Yaffe, we have always been that way.

"Q. Have you been aware of it?

"A. Always.

"Q. Have you in discussions with the school board ever tried to do anything about eliminating this problem?

"A. Nothing except trying to fix over what schools we have, putting them in through our maintenance department."

The testimony of Mayor James H. Gorbey is also instructive here:

"Q. And were you aware of the situation with respect to some of the schools in the City of Chester being either completely Negro or predominantly Negro?

"A. Yes.

"Q. Was that brought to your attention recently or were you aware of it quite some time?

"A. I knew it for some time. It seemed to me back in 1927 or thereabouts, I understood that the Negro people requested that, to have separate schools. That's the way I have been told all my life."

Under such circumstances we should not hesitate to find that the Commission has power to act in this case.

The School Board has attempted to justify its inaction in this matter by pointing to patterns of residential segregation in the community at large. In its answer it asserts: "There are three Elementary schools and one Junior High School in Respondent's system which have either all negro pupils or almost entirely all negro pupils. Respondent avers that the sole cause for this is the housing pattern in the City of Chester and the fact that negroes either willingly or because of necessity live in the same neighborhoods."

I find this defense insufficient. Courts in other jurisdictions have recognized that where such residential segregation exists it is not enough for school authorities to refrain from willful discriminatory acts.

The Supreme Court of California stated in *Jackson v. Pasadena City School District,* 59 Cal. 2d 876, 382 P. 2d 878, 882 (1963): "The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic

basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause."

Similarly, in *Branche v. Board of Education*, 204 F. Supp. 150, 153 (E.D. N.Y. 1962), the Court stated: "The educational system that is . . . compulsory and publicly afforded must deal with the inadequacy arising from adventitious segregation; it cannot accept and indurate segregation on the ground that it is not coerced or planned but accepted. Failure to deal with a condition as really inflicts it as does any grosser imposition of it." Cf. *Blocker v. Board of Education*, 226 F. Supp. 208 (E.D. N.Y. 1964).

In short, the School District has a continuing duty to re-evaluate school zone lines in order to maintain uniformily high standards of public education. Corrective action is surely warranted when local authorities ignore this obligation, while consciously and rigidly adhering to school district lines which result in a segregated educational system.

In the instant case, the Commission has clearly demonstrated a persistent and knowing failure by the Chester authorities to correct, or attempt to correct, the severe racial imbalance in the City's schools. Such a showing should be sufficient to confer jurisdiction on the Commission to enter a remedial order under the terms of the Human Relations Act.

In concluding that the order of the Commission should be affirmed, however, I do not rely solely on the passive acquiescence of the School Board. The record before us reveals numerous affirmative acts by the Chester School District which suggest approval of the status quo and a desire to perpetuate the imbalance in the City's schools.

First, boundary lines defining the all-Negro Dewey-Mann School have been altered from time to time by the School Board. Mr. John J. Vaul, assistant superintendent, testified as follows concerning these changes:

"Mr. Yaffe: What would have happened with the composition of the school population if those boundary lines had remained is the question.

"The witness: It would have remained integrated."

Second, the School Board approved new boundary lines for the City's elementary schools on May 4, 1964. In September of 1964, these changes were rescinded with one exception. The exception is an area referred to as a "panhandle," which is entirely white in composition. Although it was previously part of the all-Negro Dewey-Mann attendance zone, it is now within the boundaries of the substantially all-white William Penn School. Even before the change in attendance zones, at least one white pupil living in the area was permitted to cross boundary lines in order to attend the William Penn School.

Third, orthogenic backward pupils in Chester are assigned to two schools, Dewey-Mann and Martin. In theory, all such pupils in the western part of the City are assigned to the all-Negro Dewey-Mann School. In fact, only Negro backward pupils are assigned to Dewey-Mann. White backward pupils in that area are permitted to remain in their regular classes.

Fourth, ninth-grade tuition students from adjoining school districts are assigned to two Chester junior high schools, the all-Negro Douglass and the integrated Pulaski. The record shows that only Negro tuition pupils have been assigned to the Douglass School.

Fifth, the School District has invariably assigned Negro teachers and clerical personnel only to the City's all-Negro schools.

Sixth, at the time of the hearings, Chester's all-Negro schools were significantly inferior in physical

condition to the remaining schools in the system.[3] They were also significantly more crowded.[4]

It is surely unrealistic to expect the Chester school authorities to concede that their actions have been generated by any factor other than an attempt to operate an efficient school system. Nevertheless, I think it proper to infer from this record a policy of active approval toward the racial imbalance in the City's schools.

Construing the Human Relations Act in light of its remedial purpose and the record before us, I believe the Commission's jurisdiction in this case should be upheld. In so concluding, I do not read the statute to require the complete abandonment of Chester's "neighborhood school" policy. Nor do I think it demands a fixed ratio of whites to Negroes in every City school.

In each case, the interests protected by adherence to neighborhood attendance zones must be weighed against the substantiality of the racial imbalance in the

---

[3] With the cooperation of the School Board, Mr. Louis Dallett, a member of the City's Human Relations Commission, inspected several of Chester's all-Negro schools. He offered the following testimony:

"There were many spots in the two worst schools where plaster was off the walls, around plates, sadly in need of paint. The wood frames around the windows were in very bad condition. Many of these large, old windows were loose in their frames causing very drafty conditions. The toilet facilities were very, very poor in these schools mentioned. In many cases, there was a single light bulb for lighting, an exposed bulb. . . . We found a lack of room for the coats and other paraphernalia for winterwear. We found a generally poor condition of maintenance. There was surface dirt all about. The maintenance was not very well kept up as opposed to the only white school we visited where there was a tremendously higher level of maintenance and cleanliness."

[4] Classes in the substantially all-Negro elementary schools contained an average of 32 to 37 pupils. In the remaining elementary schools, the figure ranged from 30 to 33 pupils per class.

community's schools. An agency such as the Human Relations Commission is best equipped to make these difficult judgments, and flexible enough to enter appropriate remedial orders.

Accordingly, I would modify the order of the lower court by reinstating those provisions of the Commission's order directed at racial imbalance in the Chester schools.

SPAULDING, J., joins in this dissenting opinion.