Balsbaugh et al., Appellants *v.* Rowland.

Argued January 20, 1971; reargued January 18, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*William H. Naugle,* with him *Naugle & Sullivan,* for appellants.

*James W. Evans,* Solicitor, for Harrisburg School District, appellees.

OPINION BY MR. JUSTICE POMEROY, April 20, 1972:

This case comes to us on appeal from the order of the court below sustaining a demurrer to appellants' complaint in equity. Appellants, citizen taxpayers of the City of Harrisburg, brought this action on behalf of themselves and all other taxpayers in the Harrisburg City School District (the District), seeking declaratory relief and to enjoin the District's Board of School Directors (the Board) and its Superintendent of Schools from implementing "A Plan for Quality Desegregated Education for the Harrisburg City School District" (the Plan), which would, among other things, correct a racial imbalance in the District.

We learn from the briefs that the challenged Plan was the culmination of a two-year effort by the school board to devise an acceptable method of improving its educational program by balancing the racial composition of the District's schools. The effort apparently

stemmed from a finding by the Pennsylvania Human Relations Commission that significant racial imbalance existed in the District's schools, and that steps should be taken to correct it.

In 1968 and again in 1969, plans were submitted by the Board to the Commission, but found to be unsatisfactory. Thereafter, the Board retained the services of a non-profit educational consulting service known as Research for Better Schools, Inc., of Philadelphia to "prepare and present to the Board for its consideration a written plan for the systematic racial desegregation of the Harrisburg Public School System." In April of 1970 the consulting firm presented a proposed plan to the Board, which duly adopted it. We are told that the Plan and its implementation was later approved by the Department of Public Instruction of the Commonwealth and by the Human Relations Commission.

Within a few weeks after the Plan was adopted by the Board, appellants filed their complaint in equity, naming as defendants the members of the school board and the superintendent of schools. After a hearing, appellants' application for a preliminary injunction was denied. Appellees then filed preliminary objections in the nature of a demurrer to the complaint, which were sustained by the court *en banc*, President Judge KREIDER dissenting. This appeal followed.[1]

A demurrer, of course, is an assertion that the complaint does not set forth a cause of action upon which relief can be granted. It admits, for the purpose of testing the sufficiency of the complaint, all properly pleaded facts, but not conclusions of law. *Engel v.*

---

[1] The case was originally argued in January, 1971. We ordered reargument, which took place in January, 1972. A motion to dismiss or quash the appeal was withdrawn by appellees at the second argument, and we find it unnecessary to consider that issue.

*Parkway Co.*, 439 Pa. 559, 266 A. 2d 685 (1970) ; *Robinson v. Philadelphia*, 400 Pa. 80, 82, 161 A. 2d 1 (1960) ; *Fawcett v. Monongahela Co.*, 391 Pa. 134, 137 A. 2d 768 (1958) ; *Gardner v. Allegheny County*, 382 Pa. 88, 114 A. 2d 491 (1955) ; *Narehood v. Pearson*, 374 Pa. 299, 302, 96 A. 2d 895 (1953).

The factual averments of the complaint before us may be summarized as follows: (1) The Board adopted the Plan of desegregation and reorganization on May 8, 1970, pursuant to a Board resolution of February 13, 1970. By this resolution the Board "re-affirm[ed] its policy of developing integrated quality education in the District", and to that end "adopt[ed] as a policy the reorganization of all elementary units for the school year beginning September 1970, so that the student enrollment in each school will reflect within ten percent (10%) the racial composition of the total public school population."[2] (2) By reason of the Plan the 1970-71 school year budget as tentatively adopted by the Board on May 22, 1970, contained proposed expenditures of $1½ million more than those for the preceding school year. (3) The Plan requires daily cross-city busing of approximately 28% of the students enrolled in the District schools in order to establish racially balanced school attendance patterns. (4) The proposed budget for 1970-71 placed the cost of busing, school bus monitors, and a school lunch program for transported children at more than $500,000 but made no provision for certain other unstated costs involved in the program, estimated at an additional $300,000 to $500,000. (5) The Plan resulted from the desegregation directive giv-

---

[2] The full text of the Plan as adopted on May 8, 1970 was not attached to the complaint. It was, however, submitted both to the lower court and to our Court, and we consider it in this opinion as if properly identified in and made part of the complaint.

en to the Board by the Pennsylvania Human Relations Commission. (6) No segregation has ever existed within the Harrisburg Public School system nor has the Board ever embarked on any "Plan of Segregation". (This averment is arguably a conclusion of law.)

Following the recitation of these facts, the complaint states the legal conclusion that the adoption of the Plan was "unconstitutional and unreasonable". Three reasons are given in support of this conclusion:

(1) equal protection of the laws is denied to the students, parents and taxpayers of Harrisburg;

(2) the plan was not the result of a prudent exercise of discretion by the appellee board members, but of an element of duress employed by the Human Relations Commission;

(3) the plan is not reasonable because (a) of "undue emotional and physical hardships" imposed upon students and parents by the "elimination of the existing neighborhood school structure", (b) of unresponsiveness to the will of the citizens and taxpayers of Harrisburg; and (c) it includes within its purview the junior and senior high schools. The complaint alleges, finally, that the expenditure of tax monies in pursuance of the Plan is "needless, wasteful and arbitrary".

We turn to a consideration of the Plan itself, for its terms and provisions constitute the basis of the complaint.

As the Plan itself states, it was designed to achieve a number of goals, including "educational excellence, racial balance, equity, stability and economy". In its pursuit of such ends, the Plan establishes an early childhood education program designed to bring together pre-kindergarten through second grade age children in special "early childhood" centers. The centers are intended to offer a wide variety of programs and facilities which smaller neighborhood schools could not economi-

cally provide.[3] Programs and groupings with similar purpose are included in the Plan's reorganization and consolidation of the District's schools into elementary (grades three to six), intermediate (grades seven and eight), and comprehensive high schools (grades nine through twelve).

The Plan declares interaction between students of different races, cultural groups, economic backgrounds, and levels of achievement to be an essential component of quality education. Thus, the Plan envisions random assignment (by computer) of each child not only on the basis of race, but also on the basis of sex, socio-economic status and academic achievement "in order to achieve completely mixed schools and classrooms". The Plan provides, moreover, that the same instructional programs be made available to every child.

As an aid in achieving such a heterogeneous school and classroom composition, the Plan calls for the busing of approximately 29 percent of the total number of students presently enrolled in the Harrisburg public school system. It is explained, however, that "[n]o racial group will have to transport more children than any other group; each group will be subject to transportation equally since the computer program will assign each child at random on the basis of race, socio-economic status and academic achievement in order to achieve completely mixed schools and classrooms."

Under the Plan, several criteria are to be considered in developing balanced assignment of students to schools and classes within schools: (1) Black and white pupils are to be distributed with a maximum variance of ten percent from the total percentage of such chil-

---

[3] Psychological services, science equipment, programmed reading materials, diagnostic resources, and more individualized instruction are among the features contemplated by the Plan to be made available to all children of this age group.

dren enrolled in the District; (2) Students are to be evenly distributed throughout the schools on the basis of sex; (3) Children from impoverished families are to be distributed throughout the school system, with a maximum variance of ten percent from the total number of such children enrolled in the District; (4) For grades three through six, children evaluated to be on the extremes of an achievement scale are to be evenly distributed, ". . . so that all schools will have about the same percentage of children deficient in basic skills, as well as those most capable of pursuing independent study."

The Plan also estimates that the reorganization of the District which it necessitates will prove more economical in the long run than the present set-up because it will eliminate duplication of services and programs heretofore necessary in the neighborhood school system.

In short, it is evident from a study of the Plan that it calls for a comprehensive restructuring of the school system, and this not only to achieve racial balance, as required by the Human Relations Commission, but to develop a new educational approach to the instruction of children enrolled in the District.

The thrust of appellant's complaint is in two directions: (1) the adoption of the Plan was not the result of properly exercised Board discretion, and (2) the Plan violates the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. As a result of either or both of these infirmities, the complaint charges, the expenditure of tax monies is illegal and enjoinable. Before considering whether a cause of action has been stated in these respects, it will be well to refer briefly to the powers of school boards and the degree of supervisory control which the courts have with respect to them.

The Public School Code of 1949, Act of March 10, 1949, P. L. 30, as amended, 24 P.S. §1-101 et seq., vests

broad powers in the boards of school directors. By §501 et seq. of the Code, 24 P.S. §5-501 et seq., a school board is authorized to establish, equip and maintain kindergartens, elementary schools, high schools, trade and, vocational schools, libraries, cafeterias, etc., and "[s]uch other schools or educational departments as the directors, in their wisdom, may see proper to establish." (§502). Article XIII of the Code (24 P.S. §13-1301 et seq.) authorizes school boards to admit and assign pupils to their schools. These powers are specifically set forth in §1310, 24 P.S. §13-1310.[4] Section 1361, 24 P.S. §13-1361, provides that school boards may provide "free transportation of any resident pupil to and from the public schools. . . ." By §507 of the Code, 24 P.S. §5-507 a board of school directors is "vested with all the necessary authority and power annually to levy and collect . . . the necessary taxes" to operate the public schools in the district and in general to enable the board to carry out any provisions of the Code.

In approaching the questions presented, it is well to bear in mind that "courts are in no position to exercise control over schools and determine the policy of school administration; the judges ordinarily are not equipped for this immense task." *Wilson v. School District of Philadelphia*, 328 Pa. 225, 236, 195 Atl. 90 (1937). As we stated in *Landerman v. Churchill Area School District*, 414 Pa. 530, 534, 200 A. 2d 867 (1964), "In order for a court of equity to grant relief, it must

---

[4] It is interesting to note that §1310 includes a provision forbidding discrimination on account of race or color: "It shall be unlawful for any school director, superintendent or teacher to make any distinction whatever, on account of, or by reason of, the race or color of any pupil or scholar who may be in attendance upon, or seeking admission to, any public school maintained wholly or in part under the School laws of the Commonwealth." This provision was derived from the Act of June 8, 1881, P. L. 76, §1 (repealed). See *Taylor v. Entriken*, 214 Pa. 303, 63 Atl. 606 (1906).

clearly be shown that the school board acted outside the scope of its statutory authority or not in good faith. 'It is only where the board transcends the limits of its legal discretion that it is amenable to the injunctive processes of a court of equity: . . .' *Spann v. Joint Boards of School Directors*, 381 Pa. 338, 349, 113 A. 2d 281, 287 (1955)." See also *Hibbs v. Arensberg*, 276 Pa. 24, 119 Atl. 727 (1923). Our scrutiny of the complaint in this case satisfies us that it does not set forth an abuse of discretion or illegality which is sufficiently clear and serious to state a cause of action in equity, and that the lower court was correct in sustaining the demurrer.

We turn now to a consideration of the two principal arguments of appellants, viz., (1) that the Board in adopting the Plan was not exercising its own judgment but acting under compulsion of the Human Relations Commission, and (2) that the Plan is so unreasonable as to be constitutionally defective.

1. *The charge of duress.*

The only averments relative to the abrogation of its responsibility by the Board are those contained in paragraph 21, that the Plan "resulted from a directive given to the Board by the Pennsylvania Human Relations Commission in 1968 which declared that the Harrisburg City Schools were not racially integrated and required that a Plan for Desegregation thereof be formed", and in paragraph 23(b), that the Plan "was not the product of the reasonable and prudent exercise of discretion by the [Board]," but of "duress imposed by the Pennsylvania Human Relations Commission".

There are two answers to the argument that these facts add up to an actionable claim on the part of appellants. The first is that the Human Relations Commission is well within its rights in ordering that steps

be taken to eliminate racial segregation found to exist within the student population of any school district. Pennsylvania Human Relations Act, §§5(i)(1) and 9, Act of October 27, 1955, P. L. 744, as amended, 43 P.S. §§955(i)(1) and 959. In *Pennsylvania Human Relations Commission v. Chester School District*, 427 Pa. 157, 233 A. 2d 290 (1967), we laid to rest arguments to the effect that the Human Relations Act did not permit the Commission to require school boards to take corrective measures to overcome *de facto* racial segregation within their districts.[5] It is to be noted that so far as the record before us shows, no challenge of any kind has been made by appellants to the legality or propriety of the directive of the Commission that steps be taken to create a better racial balance, nor was this directive contested by the school Board. Thus, as the lower court observed in the case at bar, "if it could be said that the sole basis for the defendants' action in implementing the plan of which plaintiffs complain was the Commission's directive, they were doing what a duly constituted and authorized state agency was ordering them to do, and this cannot be called 'duress' ".

The other reason the charge of duress is hollow is to be found in the Plan itself. Although the Plan may have been prompted by the Commission order to do away with school segregation, it patently does this and much more. As stated earlier in this opinion, racial balance was only one of several goals the Plan was designed to achieve. As we read the Plan, it represents a salutary endeavor by the Board to improve the quality of education within the District while at the same time complying with the instruction of the Human Rela-

---

[5] For a discussion of the Pennsylvania Human Relations Act and the related statute in the field of education, the Fair Educational Opportunities Act, Act of July 17, 1961, P. L. 776, No. 341, 24 P.S. §5001, including this Court's decision in *Chester School District, supra*, see *Pennsylvania Civil Rights Legislation: Substantive Aspects*, 30 U. Pitt. L. Rev. 9 especially at pp. 31 and 35 (1968).

tions Commission. This was surely within the scope of its statutory authority.

2. *The charge of unconstitutionality.*

The other and more fundamental charge of the complaint is that the adoption of the Plan denies to the students, parents and taxpayers of Harrisburg the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States. This allegation is of course purely conclusory, but seems to be based upon the arguably factual averment that the Plan is unreasonable because the elimination of "the existing neighborhood school structure" causes undue emotional and physical hardships upon students and teachers and is unresponsive to the will of the citizens and taxpayers of the city. This allegation is also *in pari materia* with the allegations (1) that the expenditure of public monies in order to finance an unconstitutional program, particularly as it provides for pupil transportation, is also unconstitutional, and (2) that no racial segregation has ever existed in the Harrisburg schools.[6] In sum, this second thrust of the com-

---

[6] This assertion undoubtedly is meant to state that any racial imbalance within the District is not the product of so-called *de jure* segregation, for the Plan itself makes reference to "five *de facto* segregated schools" in the Harrisburg system.

The term *"de facto"* means literally in fact, or actually, and is usually used in contradistinction to *"de jure"*, meaning by law or by right. In relation to racial segregation *"de facto"* means segregation which does in fact exist, as distinguished from segregation which is imposed by law or by public authority, i.e., *de jure*. We repeat here the observation contained in footnote 1 of our decision in *Pennsylvania Human Relations Commission v. Chester School District, supra,* 427 Pa. at 158-59:

"As the courts below observed, de facto segregation 'remains undefined in its full concept', yet at the same time it is a meaningful term. 85 Dauph. 18, 25, 224 A. 2d 811, 820 (1966). According to one student of the problem, 'de facto segregation may be defined simply as the racial imbalance in schools which occurs when

plaint seems to be premised on the assumption that there is some sort of inherent right, enforceable by parents, pupils and taxpayers, to a "neighborhood school". The essence of the charge is that when a school board undertakes to correct racial imbalance resulting from *de facto* segregation by a program which involves pupil assignment and transportation and thereby eliminates or radically changes the pre-existing pattern of neighborhood schools,[7] it has violated the Equal Protection Clause. We emphatically disagree.

It is true, of course, that virtually all decisions concerned with the desegregation of racially imbalanced schools and school districts have been with reference to governmentally imposed dual school systems established along racial lines. See the decision of the United States Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 98 L. Ed. 873 (1954), and its numerous progeny, including the recent decision of that Court in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 28 L. Ed. 2d 554 (1971).[8] The Court in

the number of Negroes in a compact Negro area becomes so great that drawing school zone boundaries on a geographical basis causes the great majority of Negro children to attend schools which are overwhelmingly Negro in population.' Kaplan, Segregation Litigation and the Schools—Part I: The New Rochelle Experience, 58 Nw. L. Rev. 1, 2 (1963). See also United States v. Jefferson County Bd. of Educ., 372 F. 2d 836, 878 n. 92 (5th Cir. 1966), for other definitions of the term."

See also *State of Washington ex rel. Citizens Against Mandatory Bussing v. Brooks*, 80 Wash. 2d 121, 492 P. 2d 536 (1972), footnote 2.

[7] Preservation of "neighborhood schools" was also an issue in *Penna. Human Relations Comm. v. Chester School District, supra*. See 427 Pa. at 174, 175.

[8] As the Court observed in *Charlotte-Mecklenburg*: "The constant theme and thrust of every holding from Brown I to date is that state-enforced separation of races in public schools is discrimination that violates the Equal Protection Clause. The remedy commanded was to dismantle dual school systems." 402 U.S. 22, 28 L. Ed. 2d 570.

*Brown* found the separate *de jure* education there under review "inherently unequal" and thus violative of the Equal Protection Clause.[9] The present case presents the reverse proposition, viz., that voluntary correction by a school board of racial imbalance, which imbalance is not the result of state action, is unconstitutional discrimination against those whose past arrangements are disturbed thereby, at least if one of the corrective measures is pupil assignment and transportation. Appellants cite no authority for this proposition, and we know of none.

A reading of the Plan itself manifests the meticulous care which appellees have taken to render the assignment and busing of pupils fair and equitable. As we observed earlier in this opinion, the Plan stipulates that "[n]o racial group will have to transport more children than any other group"; random assignments by computer will achieve a student mix on the basis of race, socio-economic status, and academic achievement. The Plan further provides that "[t]he same instructional programs will be available to everyone. . . . The reassignment of pupils to schools throughout the system also lends itself to a better distribution of professional and nonprofessional staff. . . . To be consistent with the standard of group equity, there will be a policy of fair recruitment, selection, placement, and promotion of staff on all levels in the school system. . . . The method of assigning students to each school will allow for adjustment of ratios each year to coincide

---

[9] The Fourteenth Amendment is not necessarily the only constitutional basis for the protection of the rights of racial minorities. See, e.g., *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 20 L. Ed. 2d 1189 (1968), holding that the Thirteenth Amendment empowered Congress to abolish all badges and incidents of slavery, and *Sullivan v. Little Hunting Park*, 396 U.S. 229, 24 L. Ed. 2d 386 (1969), upholding an act of Congress (42 U.S.C. §1982) which barred racial discrimination in the private sale or rental of real property.

with total population ratios. . . ." If busing may be said to be a burden imposed by the Plan, it is patently clear that the burden, along with the concomitant benefits of an improved educational environment and more and better services and facilities, is evenly distributed among all students.

Furthermore, we note that the United States Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education, supra,* again addressed itself to the problems involved in achieving integration in a school system where segregation through two sets of schools had theretofore been a deliberate governmental policy. On the subject of transportation of students, the Court observed, "Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one room schoolhouse to the consolidated school. Eighteen million of the nation's public school children, approximately 39%, were transported to their schools by bus in 1969-1970 in all parts of the country. The importance of bus transportation as a normal and accepted tool of education policy is readily discernible in this and the companion case." 402 U.S. 29, 28 L. Ed. 2d 574. After analyzing the situation existing in the Charlotte-Mecklenburg district, the Court concluded that in the circumstances it found "no basis for holding that the local school authorities may not be required to employ bus transportation as one tool of school desegregation." 402 U.S. 30, 28 L. Ed. 2d 575.

By the same token, in the companion case of *North Carolina Board of Education v. Swann,* 402 U.S. 43, 28 L. Ed. 2d 586 (1971), the Court struck down a state statute which forbade assignment of any student on account of race or for the purpose of creating a racial balance or ratio in the schools. Said the Court: "Just as the race of students must be considered in determin-

438

ing whether a constitutional violation has occurred, so also must race be considered in formulating a remedy. To forbid, at this stage, all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate existing dual school systems." 402 U.S. 46, 28 L. Ed. 2d 589.[10]

If assignment and busing of pupils may be acceptable, and indeed required, methods of attempting to overcome racial segregation where that condition is historically of *de jure* origin, it would indeed be anomolous if they were nevertheless considered to be unreasonable, discriminatory and therefore unconstitutional methods when voluntarily employed by a state to rectify an imbalance which is the product of *de facto* segregation.[11] As the Court stated generally in *Charlotte-Mecklenburg,* "[s]chool authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole." 402 U.S. 16, 28 L. Ed. 2d 566, 567. That is precisely what the Board in Harrisburg has done in adopting the challenged Plan. We see no basis whatever for holding that its action is in any

---

[10] See Note, *Bussing—A Permissible Tool of School Desegregation,* 49 J. Urban Law 399 (1971) : Owen M. Fiss, *The Charlotte-Mecklenburg Case—Its Significance for Northern School Desegregation,* 38 U. Chi. L. Rev. 697 (1971).

[11] The Supreme Court of Washington has recently come to the same conclusion. *State of Washington ex rel. Citizens Against Mandatory Bussing v. Brooks,* 80 Wash. 2d 121, 492 P. 2d 536 (1972). As the court there well said, "Reason impels the conclusion that, if the constitution supports court directed mandatory bussing to desegregate schools in a system which is dual 'de jure', then such bussing is within the appropriate exercise of the discretion of school authorities in a system which is dual 'de facto' ". 80 Wash. 2d 128, 492 P. 2d 541.

way violative of the federal Constitution or the Constitution and laws of Pennsylvania.

Decree sustaining demurrer is affirmed; costs on appellants.

Mr. Chief Justice JONES concurs in the result.