Philadelphia School District *v.* Human Relations Commission.
Pittsburgh School District *v.* Human Relations Commission.
Uniontown Area School District *v.* Human Relations Commission.
New Castle Area School District *v.* Human Relations Commission.
New Kensington-Arnold School District *v.* Human Relations Commission.

Nos. 524 C.D. 1971 and 568 C.D. 1971, argued December 7, 1971 before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER and ROGERS. Judge MANDERINO did not participate.

Nos. 744 C.D. 1971, 769 C.D. 1971 and 931 C.D. 1971, argued May 4, 1972, before Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. President Judge BOWMAN did not participate.

*Gillian R. Gilhool,* Assistant Counsel, with her *Edward B. Soken,* General Counsel, and *Martin Horowitz,* Assistant Counsel, for appellant, The School District of Philadelphia.

*Justine M. Johnson, Solicitor,* with him *Bernard Markovitz,* Assistant Solicitor, and *Thomas J. Cox, Jr.,* Assistant Solicitor, for appellant, Board of Public Education of the School District of Pittsburgh.

*Herbert Margolis,* with him *Ray, Buck, Margolis, Mahoney & John,* for appellant, Uniontown Area School District.

*Jonathan Solomon,* with him *Joseph Solomon* and *Solomon and Solomon,* for appellant, New Castle Area School District.

*Robert J. Key,* with him *Philip Corbin, Jr.,* for appellant, New Kensington-Arnold School District.

*Stanton W. Kratzok,* Assistant Attorney General, and *Jay Harris Feldstein,* Assistant General Counsel,

with them *Roy Yaffe,* Assistant Attorney General, *S. Asher Winikoff,* General Counsel, and *J. Shane Creamer,* Attorney General, for appellee.

OPINION BY JUDGE WILKINSON, August 17, 1972:

This Court has before it five cases in which the Pennsylvania Human Relations Commission has ordered a school district to submit a plan to achieve racial balance in its public schools. In all instances, the school district has appealed, assigning one or more of the following reasons on which it requests this Court to reverse the order of the Commission:

1.   There is no finding of a *de jure* segregation nor is there any evidence to support such a finding.

2.   The standards used by the Commission in determining that there was *de facto* segregation are arbitrary and capricious.

3.   The Commission may not direct the filing of a plan which the School Board cannot finance.

4.   The Commission may not file an order unless it has conducted investigations, conferences, conciliation, and persuasion prior to conducting a hearing on a complaint filed against the school district.

5.   The Commission may not order a plan to be filed to include employment practices designed to achieve racially balanced staff without an allegation in the complaint that present employment practices are discriminatory.

The first two arguments have been put to rest in Pennsylvania by the opinions and orders in *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. 157, 233 A. 2d 290 (1967), and the very recent case of *Balsbaugh v. Rowland,* 447 Pa. 423, 290 A. 2d 85 (1972).[1] It is unfortunate that the appel-

---

[1] Inasmuch as the other cases involving desegregation of school districts are usually referred to by the name of the locale or the district, this case is frequently referred to as the Harrisburg case.

lants did not have the benefit of Justice POMEROY'S able opinion in *Balsbaugh* when they prepared their appeals in the instant cases, for most of their fundamental arguments are discussed at length and discarded in that opinion. In *Balsbaugh,* the Harrisburg City School District was putting into effect a daily cross-city busing plan that would transport approximately 28% of its pupils to achieve a racial balance within 10% of the racial composition of the total public school population. The plan would cost upwards of one million dollars annually. Plaintiffs there sought an injunction against the implementation of the plan, alleging that the District adopted the plan under duress from the Human Relations Commission, and that the plan violated the equal protection clause of the Fourteenth Amendment of the Constitution of the United States. Speaking for a unanimous court, with all Justices sitting, Justice POMEROY clearly sets forth the distinction between any alleged constitutional duty of the State to provide busing to relieve *de facto* segregation as distinguished from *de jure* segregation and the right of the Human Relations Commission to require busing under authority granted to it by the legislature. "If assignment and busing of pupils may be acceptable, and indeed required, methods of attempting to overcome racial segregation where that condition is historically of *de jure* origin, it would indeed be anomalous if they were nevertheless considered to be unreasonable, discriminatory and therefore unconstitutional methods when voluntarily employed by a state to rectify an imbalance which is the product of *de facto* segregation." *Balsbaugh v. Rowland, supra,* at 438, 290 A. 2d at 93. The opinion states that the Commission is within its statutory authority to require such a plan. ". . . the Human Relations Commission is well within its rights in ordering that steps be taken to eliminate racial segregation found to exist within the student population of

any school district. . . . In Pennsylvania Human Relations Commission v. Chester School District, 427 Pa. 157, 233 A. 2d 290 (1967), we laid to rest arguments to the effect that the Human Relations Act did not permit the Commission to require school boards to take corrective measures to overcome *de facto* racial segregation within their districts." 447 Pa. at 432-33, 290 A. 2d at 90.

The argument that the requirement of the Commission for the plan to achieve racial balance within 30% of the racial composition of the total school population is arbitrary and capricious fails completely in light of the decision in *Balsbaugh* where the plan required racial balance within 10%. The argument of appellants that classroom facilities with 55% black and 45% white could not be said to be in any substantial racial imbalance, even though the District has a 9% black and 91% white school population, is one that must be made to the Human Relations Commission and not to this Court. The Commission is the body that has been designated by the legislature to determine such matters. Pennsylvania Human Relations Act, Act of October 27, 1955, P. L. 744, as amended, 43 P.S. §955. Justice ROBERTS, in *Chester,* discusses at length the Commission's jurisdiction and the history of the legislation. He concludes: "Moreover, having expressed its findings and goals in an early section, the Legislature undoubtedly envisioned a case-by-case approach to the elimination of racial imbalance in public schools. Most observers agree that when courts are forced to devise and supervise programs whose goal is the elimination of racial imbalance they are acting in an area alien to their expertise. These observers would prefer to see *de facto* segregation attacked by the community itself utilizing other organs of the government. The Human Relations Commission, whose function is to work with the parties to the dispute in an attempt to alleviate the source of

the friction through 'conference, conciliation and persuasion,' and whose procedure is considerably more flexible than the courts, is, as the Legislature recognized, better equipped to deal with this problem than the courts. 'In each case, the interests protected by adherence to neighborhood attendance zones must be weighed against the substantiality of the racial imbalance in the community's schools. An agency such as the Human Relations Commission is best equipped to make these difficult judgments, and flexible enough to enter appropriate remedial orders'." *Pennsylvania Human Relations Commission v. Chester School District, supra,* at 179, 233 A. 2d at 301-02.

The Court is very sympathetic with the position of the School Districts that it is futile to require the districts to submit plans that would meet the minimum requirements of the Commission when the increased costs incident to such plans, i.e., busing, installation of cafeterias, lunch programs, etc., are beyond the financial capabilities of the Districts. However, the costs cannot be determined with any accuracy until a minimum acceptable plan is submitted. Whether it can be implemented within the financial capabilities of the Districts, together with such support from other sources as can be generated and with any realignment of priorities, will have to be determined at that time.

A corollary argument regarding the futility of filing a plan as ordered is raised directly by Philadelphia but would seem to be applicable to most metropolitan areas. This argument is that a suitable practical plan cannot be devised without the inclusion of the adjoining suburban districts. The power of the Federal courts to order such inclusion under the rights guaranteed by the Federal Constitution is now in litigation through the Federal courts and presumably will be decided by the United States Supreme Court within the foreseeable future. We will not comment on this litigation. Once again, we

must emphasize that the cases before this Court turn on the authority of the Human Relations Commission, not on rights guaranteed by the United States Constitution. During the conference that followed the arguments of the Philadelphia and Pittsburgh cases, a plan for Philadelphia was presented by that School District "in skeleton form" and appeared on its face to be worthy of further development. No such plan was received from Pittsburgh. When these cases are remanded for further action by the Commission, consistent with this opinion, it is hoped that the Philadelphia School District can "flesh out" this plan and have its practicability and acceptability determined by the Commission. At that time, if the Commission so elects, it can be determined whether the Commission has authority to order the adjoining districts to participate.

Considerable argument is made that the Commission did not make suitable investigations, hold sufficient conferences, and attempt earnestly enough to conciliate after filing the complaints and before holding the hearings. This argument would have more weight if any substantial facts were in dispute or if it appeared that conciliation would have been profitable. With particular regard to Pittsburgh which presses this argument, following the conference held by this Court on March 14, 1972, that District was not in a position to submit any new position. A study of all the records does not disclose that the Commission acted on the basis of insufficient information or failed to attempt to resolve the matters in an amicable rather than in an adversary manner.

The one argument that will require all of these cases to be returned to the Commission for either a revision of the order or further proceedings to attempt to justify the order is the provision that a plan be submitted to "include procedures to affirmatively and effectively recruit and assign an integrated staff at all

levels for all schools." Such a requirement is incorporated in all of the orders by virtue of its inclusion as paragraph four in the May 15, 1968 Recommended Elements of a School Desegregation Plan. It was more specifically included in the order in the New Castle, Uniontown, and New Kensington-Arnold cases by providing: "By September 1973 achieve a goal that the percent black professional and the percent black non-professional staff be in proportion to the percentage black population of the community of the school district. Failure to achieve said goal will not be considered a violation of this decree provided the district produces evidence of a good faith effort to reach said goal."

The Commission did not include in any complaint any specific allegation of discrimination in hiring practices. The defendant School Districts were not called upon or put on notice to produce any evidence as to their recruitment and hiring practices or any effort or lack of effort which they may have made to recruit black professional and non-professional staff. The Commission's reply is that it is basing its order on *de facto* racial imbalance in professional and non-professional staff and not on *de jure* imbalance. It asserts that it has authority to correct *de facto* racial imbalance in the staff by analogy to its authority to correct *de facto* segregation of pupils within a district. We quote the identical language that appears in the Commission's briefs in New Castle, Uniontown, and New Kensington-Arnold: "Since, therefore, by analogy, the School Board has the affirmative duty to overcome the effects of *de facto* segregation, it also has the affirmative duty to overcome racial imbalance in professional and non-professional staff in order to achieve that atmosphere of racial equality which promotes minority achievement as well as respect and understanding by the majority." Any analogy between *de facto* segregation of pupils

within a district based on the percentage of black and white student population of the district and *de facto* imbalance of the staff within the district based on either the pupil population or the general population of the district is superficial indeed. The staff is not drawn from the pupil or general population of the district. Its selection is based on both ability and availability. No case has been drawn to our attention which holds that a district is permitted to have a plan for the affirmative recruitment of minority staff under the Pennsylvania Human Relations Act, much less that such an affirmative recruitment plan may be required. *See Romain v. Middletown Area School District,* 1 Pa. Commonwealth Ct. 419, 275 A. 2d 400 (1971).

In *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F. 2d 159 (3rd Cir. 1971), the Third Circuit Court of Appeals upheld the Philadelphia Plan for affirmative recruitment of employees of contractors for building projects supported by Federal funds. However, the court discussed at considerable length the possibility that such a program was violative of the Pennsylvania Human Relations Act but stated: "If the Plan was adopted pursuant to a valid exercise of presidential power its provisions would, of course, control over local law." 442 F. 2d at 166. After discussing the provisions of the Pennsylvania Human Relations Act, the opinion, in a footnote, points out: "Moreover, we do not know how the Pennsylvania courts or the Pennsylvania Human Relations Commission would react to a scheme of 'benign' quota hiring." 442 F. 2d at 166 n. 14.

This Court is not prepared to approve an order that requires a school district to adopt an affirmative recruitment program for professional and non-professional staff on a record completely barren of testimony concerning the cause of the present employment ratio or whether there is any need for a change in the employment practices of the district.

Without minimizing any of the many difficult problems presented to the Human Relations Commission and the School Districts in all of these cases, the big problem relates to busing—Who is to decide when and how to bus school children from their "neighborhood schools"? The Pennsylvania Supreme Court in *Chester*, with the then Chief Justice and the present Chief Justice dissenting, reversing the Superior Court and the Dauphin County Court, has established the law of Pennsylvania to be that unless and until the Human Relations Act is changed by the legislature, the Pennsylvania Human Relations Commission has the authority to order busing to correct *de facto* segregation.

According, we enter the following

### ORDER

Now, August 17, 1972, the records in these cases are remanded to the Pennsylvania Human Relations Commission for it, after such further conferences, hearings, conciliation and persuasion, if any, as it feels appropriate, to modify the orders in accordance with this opinion.

-------

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. I do not believe that the records in these cases support a finding of a de facto segregation[1] and, in the absence of this prerequisite, the Pennsylvania Human Relations Commission (Commis-

-------

[1] In the case of the *School District of Pittsburgh v. Pennsylvania Human Relations Commission*, No. 568 Commonwealth Docket 1971, the appellant concedes that de facto racial segregation exists but persuasively contends that the Commission ignored the statutory procedural requirements mandating that the Commission endeavor to eliminate the practice complained of by conference, conciliation and persuasion prior to conducting a hearing on a complaint filed against the School District of Pittsburgh.

sion) is without the authority to order these school districts to submit plans to achieve racial balance in its public schools. The Commission does not assert that there exists any de jure racial segregation in these cases. In 1954, the Supreme Court of the United States held that it is unconstitutional for a state to enforce the segregation of school pupils in a racial basis. *Brown v. Board of Education,* 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). It seems to me that the common impression which developed from that decision was that the Court had ordered the racial integration of the public schools. Even some courts seemed to miss the distinction between legal desegregation and physical integration.

In 1971, the Supreme Court again enunciated that "racial imbalance" and "segregation" are not synonymous terms and that the Federal Constitution does not require that every school reflect the racial composition of the school system as a whole. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S. Ct. 1267, 28 L. Ed. 2d 554, *rehearing denied,* 403 U.S. 912, 91 S. Ct. 2200, 2201, 29 L. Ed. 2d 689 (1971).

In 1967, the Pennsylvania Supreme Court held that the Pennsylvania Human Relations Act[2] permitted the Pennsylvania Human Relations Commission to require school boards to take corrective measures to overcome *de facto racial segregation* within their districts. *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. 157, 233 A. 2d 290 (1967). In *Chester, unlike here,* there was no serious question as to the existence of de facto segregation. Justice ROBERT's opinion in that case stated that "[a]t the time of the hearing the racial composition of the schools in question was:

---

[2] Act of October 27, 1955, P. L. 744, as amended, 43 P.S. §951, et seq.

|              | White | Negro | Total | % Negro |
|--------------|-------|-------|-------|---------|
| Douglass     | 1     | 527   | 528   | 99-¦-   |
| Dewey-Mann   | 0     | 823   | 823   | 100     |
| Franklin     | 10    | 1018  | 1028  | 99      |
| Lincoln      | 69    | 490   | 559   | 87      |
| Washington   | 0     | 782   | 782   | 100     |
| Watts        | 0     | 344   | 344   | 100     |

"Clearly, the above figures, which are not disputed, satisfy any definition of de facto segregation." 427 Pa. at 178, 233 A. 2d at 301. I certainly agree with that inescapable conclusion, but here we have figures that just as clearly do not satisfy any definition of de facto segregation.[3]

This then brings a consideration of these cases to the vital question. What constitutes de facto segregation? It is the Commission's determination, that the ratio of 55% blacks and 45% whites in certain schools constitutes de facto segregation, which compels me to dissent.[4]

---

[3] In Uniontown Area School District, one elementary school, East End, has 55.9% blacks in its student body. The Park School has 36% blacks and none of the other fourteen schools in the district has more than 17.4% blacks in its student body, although there are 89 pupils in Special Education, of which 23.5% were blacks. On September 22, 1970, the New Castle Area School District operated fourteen schools and eleven of these had no more than 15.7% of their student bodies black. The percentages of blacks in the remaining three schools were 23.1%, 47.2% and 58.2%. A similar situation exists in the New Kensington-Arnold School District where eight of their ten schools had no more than 13.8% of their student body black. The percentages of blacks in the remaining two schools were 21.3% and 55.8%.

[4] Contrast this with the conclusion reached by the Commission relative to the Philadelphia School District for the school year 1970-71, when 60.5% of the Philadelphia public school population was black, where the Commission found as findings of fact that a Philadelphia senior high school 72% black *was not* segregated, a Philadelphia junior high school, 84% black *was not* segregated and a Philadelphia elementary school 77% black *was not* segregated.

Our Supreme Court has stated in significant footnotes in both *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. at 158-59 n.1, 233 A. 2d at 291 n.-1, and *Balsbaugh v. Rowland,* 447 Pa. 423, 434-35 n.6, 290 A. 2d 85, 91 n.6 (1972), that "[a]s the courts below observed, de facto segregation 'remains undefined in its full concept,' yet at the same time it is a meaningful term. 85 Dauph. 18, 25, [40 D. & C. 2d 493, 501, *aff'd mem.,* 209 Pa. Superior Ct. 37,] 224 A. 2d 811, 820 (1966). According to one student of the problem, 'de facto segregation may be defined simply as the racial imbalance in schools which occurs when the number of Negroes in a compact Negro area becomes so great that drawing school zone boundaries on a geographical basis causes the great majority of Negro children to attend schools which are overwhelmingly Negro in population.' Kaplan, Segregation Litigation and the Schools—Part I: The New Rochelle Experience, 58 Nw. L. Rev. 1, 2 (1963). See also, United States v. Jefferson County Bd. of Educ., 372 F. 2d 836, 878 n. 92 (5th Cir. 1966), for other definitions of the term."

Here in three of these cases (Uniontown, New Castle, and New Kensington-Arnold), we do not have a great majority of black children attending schools which are overwhelmingly black in population. Here we do have the school districts protesting and denying the finding of the Human Relations Commission that de facto segregation exists in their schools. *It is exactly this feature which removes these cases from the controlling ambit of Balsbaugh v. Rowland, supra,* where Justice POMEROY was careful to point out that *Balsbaugh* was being decided on the basis that the existence of de facto segregation was not challenged. These significant words appear in *Balsbaugh*: "It is to be noted that so far as the record before us shows, no challenge of any kind has been made by appellants to the legality or

propriety of the directive of the Commission that steps be taken to create a better racial balance, nor was this directive contested by the school Board. . . .

". . . Although the Plan may have been prompted by the *Commission order to do away with school segregation. . . ."* 447 Pa. at 433, 290 A. 2d at 90-1. (Emphasis supplied.)

In *Balsbaugh,* de facto segregation was conceded to exist whereas, in certain of the present cases, de facto segregation is denied. We must examine the records to ascertain whether de facto segregation has been established by substantial evidence, because, if it has not, the Human Relations Commission cannot direct the appellants to submit a plan.

The Commission's findings of fact stating the variable standard of "disproportionate racial concentration", applied by the Commission to the ratios of black and white pupils found in these public schools to determine that they were segregated, are unsupported by evidence as findings of fact and erroneous as conclusions of law. The records are completely devoid of any evidence whatsoever that the Commission's standard (that a segregated school is one in which "the percent of Negro pupils is less than or more than thirty (30%) percent of the percent of Negro pupils in schools of the same grade span of a school district"[5]) properly defines segregation.

Questioned at the hearing in the Philadelphia case about this standard, which was first promulgated in *Recommended Elements of a School Desegregation Plan* by the Commission jointly with the Department of Public Instruction, the Commission's witness referred merely to the opinion of those who participated in devising the formula that it seemed fair and reasonable to them.

---

[5] Finding of Fact No. 10, *Pennsylvania Human Relations Commission v. The School District of Philadelphia,* No. 524 C.D. 1971.

This witness also lamely noted how the Commission's standard differed from Massachusetts' unfair, flat 50% formula and California's and New Jersey's unfair, though judicially defined, "substantial" imbalance standard. There was no testimony as to why measurement of racial imbalance by the racial composition of the school population of school districts is appropriate at all. Indeed, the Commission's witness admitted that it was without "scientific basis".

Plainly, the Human Relations Commission merely adopted a general policy in its *Recommended Elements* and then applied that policy to the public schools in these proceedings without considering the particular conditions of school segregation in the various schools. The Superior Court condemned such administrative practice in *Aizen v. Pennsylvania Public Utilities Commission*, 163 Pa. Superior Ct. 305, 316, 60 A. 2d 443, 449 (1948): "A previously adopted policy may not furnish the sole basis for the commission's action in a particular case. Policy cannot be made a substitute for evidence in a proceeding before it. The conditions of a particular case may require the reversal of any administrative policy. No declared regulatory policy by the commission may preclude the future exercise of its functions as an administrative agency of the legislature. Such a declaration of policy cannot be a finality regardless of circumstances."

As a conclusion of law, the Commission's variable standard of disproportionate racial concentration is equally arbitrary and capricious and surely contrary to law. Measurement of racial imbalance solely by the public school population of a single school district leads to patently arbitrary results. As pointed out before, the Commission found the Uniontown schools to have de facto racial segregation where one school out of fifteen had 55.9% blacks but found that a junior high school in

Philadelphia with 84% blacks was not racially segregated.

I have no quarrel with the quotations of law from *Chester* and *Balsbaugh* which the majority calls forth. However, each and every one is founded upon an undisputed or unchallenged existence of de facto segregation. It is true that, *once de facto segregation is established,* it is the Commission's, not the judiciary's, province to deal with the problem and to exercise its expertise to eliminate the existing segregation. Accordingly, I do differ with the majority's statement that "[t]he argument of appellants that classroom facilities with 55% black and 45% white could not be said to be in any substantial racial imbalance, even though the District has a 9% black and 91% white school population, is one that must be made to the Human Relations Commission and not to this Court."

Therefore, I conclude that these records do not support, by substantial evidence, a finding of de facto segregation or discrimination by the school districts. I would sustain these appeals and vacate the Commission's orders directing the school districts here to submit plans to eliminate alleged racial imbalance.