458 Pa. 67 (1974)
Pennsylvania Human Relations Commission, Appellant,
v.
Chester Housing Authority.
Supreme Court of Pennsylvania.
Argued January 11, 1974.
October 16, 1974.
*68 Before JONES, C.J. EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.
Sanford Kahn, for appellant.
Francis G. Pileggi, with him Pileggi and Desmond, for appellee.
OPINION BY MR. JUSTICE ROBERTS, October 16, 1974:
The Pennsylvania Human Relations Commission appeals from the order of the Commonwealth Court affirming with modification a unanimous Commission order. Chester Housing Authority v. Human Relations Commission, 9 Pa. Commonwealth Ct. 415, 305 A.2d *69 751 (1973). The Commission had ordered the Chester Housing Authority, inter alia, to take affirmative steps to remedy racial segregation found by the Commission to exist in four public housing projects administered by the Authority. Because the Commonwealth Court concluded that two of the Commission's findings of fact were not supported by substantial evidence,[1] it held unenforceable certain parts of the Commission's order. The Commission sought review of the Commonwealth Court's modification and we granted the petition for allowance of appeal.[2] We agree with the Commission that the record contains substantial evidence supporting its adjudication. We therefore reinstate those portions of the Commission's order stricken by the Commonwealth Court, and affirm that court's order so modified.
On May 1, 1970, the Commission filed a complaint alleging that the Authority maintained under its supervision four housing projects that were racially segregated in violation of section 5(h) of the Pennsylvania Human Relations Act.[3] It was also charged that actions of the Authority aided and abetted racial segregation of public schools in the City of Chester and therefore contravened section 5(e) of the Act.[4] The *70 Commission then by investigation determined that probable cause existed for crediting the allegations in its complaint.[5]
As part of its investigation, the Commission obtained the names of all persons who became tenants in the four projects from January, 1970 to May, 1971. From a list of present tenants a random selection of names was made. The sample revealed seventeen incidents of racial discrimination on the part of the Authority in the leasing of apartments. The incidents were scattered throughout the test period, and each example showed the same practice. When a black prospective tenant applied, he would be denied housing until a vacancy arose in a "black" project, even though there existed a vacancy in the "white" project.[6] Likewise, a white prospective tenant would not be offered an available apartment in a "black" project, but would instead be kept waiting until a vacancy occurred in the "white" project.
After an August 5, 1971, public hearing, the Commission entered a unanimous adjudication containing ten compound findings of fact[7] and five conclusions of *71 law.[8] The Commission accepted as true the proof of the seventeen individual acts of discrimination. It further found that as a result of a pattern of discrimination, the four projects in question were racially segregated. The findings continue by stating that the racial imbalance of these four projects increased the racial segregation of Chester public schools.[9] On the basis of these findings and the conclusions of law, the Commission ordered the Authority to cease and desist from its present tenant selection procedure and to affirmatively remedy the existing racial imbalance.[10]
The Authority excepted to almost every finding of fact, conclusion of law, and portion of the order, and took a timely appeal to the Commonwealth Court. After reviewing the evidence the lower court concluded that substantial evidence demonstrated "that certain tenants had been routed through [the Authority's] tenant placement procedure into projects whose tenant majority (usually entirety) corresponded to the tenant's race." 9 Pa. Commonwealth Ct. at 424, 305 A.2d at 755.[11] However, the Commonwealth Court did not affirm the Commission's order in toto, but rather set aside portions of it. Stricken from the order were the paragraphs directing the Authority to cease renting apartments in the "black" projects to blacks and in the "white" project to whites until the racial composition *72 in each reflected the overall racial composition in Chester's public housing; to design, have approved by the Commission, and implement a plan to bring about this uniform racial composition; to make monthly reports for two years to the Commission on the progress of the approved plan; and to meet with the Chester School District to draft a plan for the priority placement of tenants with school-age children in the to-be-integrated projects. Only the Commission appealed.[12]
Despite its agreement with the Commission's proof of racial discrimination, the Commonwealth Court believed that these violations of the Human Relations Act did not justify the Commission's order. Two complaints were voiced. The Commission had neither proved the duration of the unlawful discriminatory practices nor shown that these seventeen acts were the sole cause of the racial imbalance.[13] Aside from noting that the Human Relations Act does not explicitly require either that a particular number of acts must be proved or that *73 race must be the sole factor in bringing about discrimination before the Commission may order affirmative action, 43 P.S. § 959 (Supp. 1974), we find it unnecessary to address these assertions of the lower court. In our view, substantial evidence supporting the Commission's adjudication can be found in the figures of the racial composition of the four housing projects.
Evidence of the racial composition of the four housing projects was introduced without objection and has never been challenged. The figures amply demonstrate racial imbalance.[14]

 White tenants Black tenants
 Lamokin Village 0 346
 McCaffery Village 347 0
 Ruth L. Bennett Homes 0 385
 William Penn Village 20 257

These statistics paint as vivid a picture of racial segregation as can be imagined. Two projects were occupied 100% by blacks, another almost 100%, and apartments in a fourth were occupied exclusively by whites.
Further testimony at the public hearing revealed this almost-100% segregation to be a long-standing pattern.[15] The manager of the Ruth Bennett project *74 testified that to his knowledge there had never been a white tenant there. Similarly, the manager of Lamokin Village stated that the six years from 1964 to 1970 never saw a white occupy an apartment there. Since at least 1956, the William Penn project, according to its manager, maintained approximately the same racial composition as that existing in 1969. Except for a few black families living there at some unspecified time in the past, McCaffrey has always been occupied exclusively by whites.
Nearly identical statistics were before this Court in Pennsylvania Human Relations Commission v. Chester School District, 427 Pa. 157, 233 A.2d 290 (1967). There, we upheld an extensive Commission order designed to desegregate Chester's public schools. Necessarily, we held that the Human Relations Act reached the problem of de facto segregation. "Had the Legislature intended to reach by the 1961 amendments only de jure segregation, its legislative pronouncements would have been unnecessary. The 1954 Brown[[16]] decision made it eminently clear that de jure segregation  racial isolation produced by the acts of public officials  is unconstitutional. A legislative pronouncement to this effect, and this effect only, would be mere gild on the lily." Id. at 169, 233 A.2d at 296.
This Court has not hesitated to follow the implications of Chester School District. In Balsbaugh v. Rowland, *75 447 Pa. 423, 290 A.2d 85 (1972), we were asked to decide the constitutionality vel non of an affirmative action plan initiated by the Harrisburg School District in part to correct de facto segregation in its schools. We concluded that corrective measures, including pupil assignment and bussing, were constitutionally permissible means of overcoming segregation whether de jure or de facto. Id. at 436-39, 290 A.2d at 92-93. And in school segregation situations[17] the Commonwealth Court has sedulously enforced the rights announced in our decisions. Philadelphia School District v. Human Relations Commission, 6 Pa. Commonwealth Ct. 281, 294 A.2d 410 (1972), aff'd sub nom., Uniontown Area School District v. Pennsylvania Human Relations Commission, 455 Pa. 52, 313 A.2d 156 (1973) (upholding *76 Commission order directing five school districts to remedy de facto segregation).
While these cases arose in the context of racially segregated schools, the statutory scheme does not treat housing differently from schooling for purposes of ending racial discriminations. "The opportunity for an individual . . . to obtain all the accommodations, advantages, facilities and privileges . . . of commercial housing without discrimination because of race . . . [is] declared to be [a] civil [right]. . . ." 43 P.S. § 953 (Supp. 1974).
Removal of racial discrimination and assurance of equal opportunity in housing are strong and fundamental policies of this Commonwealth. The Human Relations Act's declaration of policy makes this explicit. "The denial of equal . . . housing . . . opportunities because of [racial] discrimination . . . threaten[s] the peace, health, safety and general welfare of the Commonwealth and its inhabitants." 43 P.S. § 952(a) (Supp. 1974). In Chester School District, we reasoned that racial imbalance triggered the Commission's authority under the Human Relations Act to order affirmative action because to hold otherwise would ignore "completely the legislative conclusion that racial segregation in public schools, whatever its source, threatens `the peace, health, safety and general welfare of the Commonwealth and its inhabitants.'" 427 Pa. at 170, 233 A.2d at 297. Today we reach a similar conclusion with respect to racial imbalance in housing covered by the Act. Mindful of our statutory duty to construe the provisions of the Human Relations Act "liberally for the accomplishment of [its] purposes," 43 P.S. § 962(a) (1964), we conclude the purposes of the Act would be vindicated only by holding, see Chester School District, that the Act covers de facto segregation in housing.
*77 Courts have resolved that blacks (and other minority groups[18]) are entitled to a meaningful opportunity to live in integrated housing.[19]Otero v. New York Housing Authority, 484 F.2d 1122 (2d Cir. 1973), is instructive. The regulations of the New York Housing Authority required it to give preference in newly-built public housing to those residents whose homes had been destroyed in order to build that housing. The Authority sought to show that adherence to its regulations would result in the newly-built projects becoming segregated.[20] *78 If the Authority did not have to abide by its regulations, the existing racial balance in the projects and the surrounding community could be maintained. The district courts[21] held that the Authority had to comply with its regulations, but the United States Court of Appeals for the Second Circuit reversed. That court reasoned that the Authority's constitutional and statutory duty affirmatively to integregate public housing superseded its obligation to follow its own regulations.[22] Therefore, "the Authority may limit the number *79 of apartments to be made available to persons of white or non-white races, including minority groups, where it can show that such action is essential to promote a racially balanced community and to avoid concentrated racial pockets that will result in a segregated community." Id. at 1140.
Crow v. Brown, 332 F. Supp. 382 (N.D. Ga. 1971), aff'd, 457 F.2d 788 (5th Cir. 1972), involved a challenge to a plan to disperse public housing, which the court found to attract largely poor blacks, in areas outside Atlanta's ghettoes. The selected sites lay in Fulton County, unincorporated but subject to the jurisdiction of the Atlanta Housing Authority. Officials of Fulton County, who by various stratagems had frustrated the implementation of the plan, were held to have acted unconstitutionally. The heart of the district court's opinion is the thoughtful conclusion that "[f]or better or worse, both by legislative act and judicial decision, this nation is committed to a policy of balanced and dispersed public housing. . . . Among other things, this reflects the recognition that in the area of public housing local authorities can no more *80 confine low-income blacks to a compacted and concentrated area than they can confine their children to segregated schools." Id. at 390 (citations & footnote omitted). The unifying theme of these and other cases is that this nation is dedicated to balanced and dispersed integrated, public housing.[23]
In trying to eradicate other manifestations of racial discrimination, courts, including the Supreme Court of the United States, have recognized that statistics alone can establish racial discrimination. Turner v. Fouche, 396 U.S. 346, 90 S. Ct. 532 (1970), confronted *81 the Supreme Court with the issue whether blacks had been excluded from grand juries because of their race. After reviewing the evidence, Mr. Justice STEWART, speaking for a unanimous Court, concluded: "In sum, the appellants demonstrated a substantial disparity between the percentages of Negro residents in the county as a whole and of Negroes on the newly constituted jury list. They further demonstrated that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria. The appellants thereby made out a prima facie case of jury discrimination, and the burden fell on the appellees to overcome it." Id. at 360, 90 S. Ct. at 540 (footnote omitted). Since no acceptable explanation was offered to rebut the prima facie case, the Supreme Court concluded that the grand jury selection process under scrutiny was unconstitutional.[24]
*82 In Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir. 1971), aff'd en banc, 461 F.2d 1171 (5th Cir. 1972) (per curiam), the United States Court of Appeals for the Fifth Circuit found a prima facie case of racial discrimination violative of the equal protection clause from statistics alone: almost 100% of the houses in Shaw not served by municipal services were occupied by blacks. Having found a prima facie case, the court considered whether a compelling governmental interest justified the disparities, and concluded none did. 437 F.2d at 1288-92.
Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970), involved employment discrimination. The court had before it statistics that the Arkansas employer had never had more than 2% blacks in its work force, and that the black population of Arkansas, according to the 1960 census, was over 21%. The Court of Appeals for the Eighth Circuit held that "these statistics, which revealed an extraordinarily small number of black employees, except for the most part as menial laborers, established a violation of Title VII of the Civil Rights Act of 1964." Id. at 426 (footnote omitted.) See 42 U.S.C.A. § 2000e-2 (a) (1974).
NLRB v. Mansion House Center Management Corp., 473 F.2d 471 (8th Cir. 1973), held that "the remedial machinery of the National Labor Relations Act cannot be available to a union which is unwilling to correct past practices of racial discrimination." Id. at 477. At issue also was whether the hearing examiner and Board had properly excluded statistics from being used to demonstrate union racial discrimination. In holding the agency decision to be error, the court stated that *83 "statistical evidence may well corroborate and establish that a union has been guilty of racial practices in the past. In face of such proof, passive attitudes of good faith are not sufficient to erase the continuing stigma which may pervade a union's segregated membership policies. The fact that no minority applicant has been rejected by the union is not the sole test." Id.
The United States Court of Appeals for the Tenth Circuit has likewise concluded that even in the absence of proof of a single act of discrimination, an unlawful employment practice in violation of 42 U.S.C.A. § 2000e-2(a) (1974) can be made out from statistics alone. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S. Ct. 972 (1971).[25]
These cases demonstrate the salutary principle: "In the problem of racial discrimination, statistics often tell much, and Courts listen." Alabama v. United States, 304 F.2d 583, 586 (5th Cir.) (footnote omitted), aff'd, 371 U.S. 37, 83 S. Ct. 145 (1962). See also Brooks v. Beto, 366 F.2d 1, 9 (5th Cir. 1966).[26] That *84 principle underlay our decision in Chester School District, and it underlies our decision today.
The Authority seeks to avoid the impact of the Human Relations Act by arguing that blacks do not want to live with whites and whites not with blacks.[27] Preliminarily, the record belies this argument. The director of the William Penn project testified that she was also responsible for the administration of another project, one for the elderly. According to her testimony, at the time of the public hearing this project was amicably integrated, with approximately an equal number of blacks and whites as tenants.
A more forceful rebuttal, however, is found in the elegant language of Justice FRANKFURTER. "Local customs, however hardened by time, are not decreed in heaven. Habits and feelings they engender may be counteracted and moderated. Experience attests that such local habits and feelings will yield, gradually though this be, to law and education. And educational influences are exerted not only by explicit teachings. They vigorously flow from the fruitful exercise of the responsibility of those charged with political official power and from the almost unconsciously transforming actualities of living under law." Cooper v. Aaron, 358 U.S. 1, 25, 78 S. Ct. 1401, 1413 (1958) (concurring opinion).[28] Or, as this Court stated in Chester School *85 District, "The best way to demonstrate the `inherent worth of [one's] neighbor' is to place individuals in a situation where they are exposed to their neighbor." 427 Pa. at 171, 233 A.2d at 297. In the final analysis, to give effect to this argument of the Authority would be to begin to undo the progress, often difficult and laborious in achievement, we as a nation have taken toward a discrimination-free society. See, e.g., Uniontown Area School District v. Pennsylvania Human Relations Commission, 455 Pa. 52, 313 A.2d 156 (1973); Balsbaugh v. Rowland, 447 Pa. 423, 290 A.2d 85 (1972); Pennsylvania Human Relations Commission v. Chester School District, 427 Pa. 157, 233 A.2d 290 (1967).
The Authority next contends that it has no responsibility to end de facto segregation because its compliance with federal law and the regulations of the United States Department of Housing and Urban Development preempts the sanctions of the Human Relations Act. This issue was raised in the Commonwealth Court and decided adversely to the Authority. Since the Authority took no appeals, it is bound by the decision of the court on this issue. See note 12 supra.
That court most emphatically rejected the factual predicate to the Authority's argument. "Reading the record with care, we find that [the Authority's] blank pronouncement of adherence to HUD's Plan B[[29]] is *86 not substantiated by sworn testimony. HUD officers testified that they never thoroughly investigated the files of [the Authority] to determine whether the plan was implemented.
"In truth, the testimony demonstrates that any HUD investigation would be futile. [The Authority] in only a few instances noted an applicant's rejection of available housing prior to ultimate acceptance of a location. This violates the HUD formulated plan which requires [the Authority] to interpose at the bottom of the list of prospective tenants an applicant who refuses housing. Where no rejections were indicated, how can one determine whether the HUD plan had been followed?" 9 Pa. Commonwealth Ct. at 423, 305 A.2d at 755.
We also cannot agree with the conclusion of the Commonwealth Court that the Commission did not support with substantial evidence its finding that racial imbalance in the four projects increased segregation in Chester's public schools. Chester School District, 427 Pa. at 170-71, 233 A.2d at 297, specifically recognized the correlation between housing patterns and segregated schooling. It would be illogical indeed to maintain that neighborhood schools do not reflect the racial composition of the neighborhoods from which they draw their pupils.[30] "One of the consequences of. . . racial concentration is that it has become virtually *87 impossible to achieve meaningful school desegregation. Indeed, as even a glimmering of objectivity will disclose, a dispersal of urban housing patterns is the only alternative to massive bussing if desegregation, rather than resegregation, is to be achieved." Crow v. Brown, 332 F. Supp. 382, 391 (N.D. Ga. 1971), aff'd, 457 F.2d 788 (5th Cir. 1972). Moreover, two officials of the Chester School District testified at the public hearing that greater racial balance in the four projects would substantially aid the district's task in integrating Chester's public schools.
Our final task is to decide whether the Commission's order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Human Relations Act. Pennsylvania Human Relations Commission v. Alto-Reste Park Cemetery Association, 453 Pa. 124, 134, 306 A.2d 881, 887 (1973) (adopting standard enunciated in Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S. Ct. 398, 406-07 (1964)).
Paragraphs two, three, and four[31] can be treated as a unit since they all relate to the Commission's directing the Authority to take affirmative steps to end the de facto segregation in its four projects. We have determined that de facto segregation in Chester's public housing is prohibited by the Human Relations Act. An unlawful discriminatory practice having been found to exist, the Commission is statutorily empowered "to take such affirmative action . . . as, in the judgment of the Commission, will effectuate the purposes of this *88 act . . . ." 43 P.S. § 959 (Supp. 1974). We cannot say on this record that the remedy embodied in paragraphs two, three, and four  designed to achieve in each of the four housing projects the same racial composition that exists throughout all the Authority's projects[32]  is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.
As for the reporting requirement (paragraph eight), this Court in Alto-Reste, supra, at 136-37, 306 A.2d at 888-89, directly approved such a remedy. We note again that the Legislature specifically authorized the Commission in its discretion to require a "report of the manner of compliance." 43 P.S. § 959 (Supp. 1974). And the Commission did not abuse its discretion in determining that two years is a reasonable time period. See Alto-Reste, supra, at 136-38 nn.7 & 8, 306 A.2d at 888-89 nn.7 & 8.
Finally, paragraph ten directs the Authority to meet with the Chester School District to draft a plan to ensure that tenants with school-age children would receive priority in being assigned housing in the to-be-integrated projects.[33] This paragraph was designed to cure the violation of 43 P.S. § 955(e) (1964), prohibiting the aiding and abetting of unlawful discriminatory practices. Not only does this portion of the order seek to remedy that violation, but it will undoubtedly also *89 aid the officials of Chester's public schools in fulfilling their obligations under Chester School District. Again, the record does not allow us to conclude that by this order a patent attempt is being made to circumvent the fairly-stated policies of the Act.[34]
Accordingly, paragraphs two, three, four, eight, and ten of the Commission's final order of April 24, 1972, are reinstated. So modified, the order of the Commonwealth Court is affirmed.
Mr. Chief Justice JONES and Mr. Justice EAGEN concur in the result.

APPENDIX A

FINDINGS OF FACT
1. Complainant herein is the Pennsylvania Human Relations Commission, an administrative agency of the Commonwealth of Pennsylvania.
*90 2. Respondent herein is the Chester Housing Authority, a public housing authority of the Commonwealth of Pennsylvania.
3. Respondent is in charge of and administers the following public housing projects in Chester, Delaware County, Pennsylvania, and the tenant selection and assignment procedures thereof:
 Lamokin Village, containing 350 units
 McCaffery Village, containing 350 units
 Ruth L. Bennett Homes, containing 390 units
 William Penn Village, containing 300 units
4. In the Summer of 1969 the racial composition of the aforesaid projects were as follows:

 Lamokin Village 346 Negroes 0 whites
 McCaffery Village 0 Negroes 347 whites
 Ruth L. Bennett Homes 385 Negroes 0 whites
 William Penn Village 257 Negroes 20 whites

5. At the time of the public hearing herein the racial composition of the aforesaid projects were maintained as above set forth.
6. Although the same type of housing accommodations was sought by both Negro and white applicants, Negro applicants whose applications were prior in time to applications of white applicants were not afforded an opportunity to rent available accommodations of the type sought in McCaffery Village but were, instead, offered accommodations in Lamokin Village, William Penn Village and Ruth L. Bennett Homes, to-wit:
A. One Larrie Ellis, a Negro female, who applied on August, 1970, for a 3-bedroom unit and on February 1, 1971, was leased a unit in Ruth L. Bennett Homes (1119 Norris) which had been vacated on January 11, 1971. During the period from August 24, 1970 to February 11, 1971, a 3-bedroom unit in McCaffery Village (2800 W. 13th Street) which is totally white, was vacated on December 4, 1970, and was rented on December 18, 1970, to one Eleanor Hayes, a white *91 female, even though she applied on November 3, 1970, a date later than when the aforesaid Larrie Ellis applied.
7. Although the same type of housing accommodations was sought by both Negro and white applicants, white applicants whose applications were prior in time to applications of Negro applicants were not afforded an opportunity to rent available accommodations in Lamokin Village, William Penn Village and Ruth L. Bennett Homes but were instead, offered accommodations in McCaffery Village, to wit:
A. One Alice Ferris, a white female, applied on January 14, 1970, for a 4-bedroom unit and on November 17, 1970, was leased a unit in totally-white McCaffery Village (1010 McCaffery) which had been vacated on November 15, 1970. During the period from January 14, 1970 to November 17, 1970, 4-bedroom units were vacated in projects which were totally-Negro or substantially Negro. All were rented to Negro tenants, to wit:
1. To one Samuel Carr, a Negro male, who was leased a unit in Ruth L. Bennett Homes (1408 Alexander) on September 10, 1970, which had been vacated on June 30, 1970.
2. To one Annie Daniels, a Negro female, who was leased a unit in William Penn Village (404 Grounsell) on August 31, 1970, which had been vacated on July 2, 1970.
3. To one Valaida Washington, a Negro female, who was leased a unit in William Penn Village (409 Pancoast) on September 18, 1970, which had been vacated on July 23, 1970.
4. To one Lawton Porter, a Negro female, who was leased a unit in William Penn Village (404 Grounsell) on September 30, 1970, which had been vacated on September 21, 1970.
*92 B. One Elizabeth Willis, a white female, applied on January 20, 1970, for a 3-bedroom unit and on November 12, 1970, was leased a unit in totally-white McCaffery Village (1200 McCaffery) which had been vacated on October 30, 1970.
One Hirst, a white male, applied for a 3-bedroom unit on March 10, 1970, and on November 17, 1970, was leased a unit in McCaffery Village (1110 Booth Street) which had been vacated on October 30, 1970. During the period from January 20, 1970 to November 12, 1970 (in the case of the aforesaid Willis) and from March 10, 1970 to November 17, 1970 (in the case of the aforesaid Hirst) the following Negroes were placed in 3-bedroom units in a totally-Negro project, to-wit:
1. One Delores Hodges, a Negro female, who applied on August 17, 1970, was leased a unit in Ruth L. Bennett Homes (922 Norris) on September 11, 1970, which had been vacated on June 2, 1970.
2. One Stinney, who is Negro and who applied on July 7, 1970, was leased a unit in Ruth L. Bennett Homes (1425 Norris) on October 10, 1970, which had been vacated on September 9, 1970.
3. One Elizabeth Gorman, a Negro female, who applied on July 15, 1970, was leased a unit in Ruth L. Bennett Homes (303 Ayars Place) on that same day and which unit had been vacated on May 15, 1970.
4. One Juanita Boyland, a Negro female, who applied on April 22, 1970, was leased a unit in William Penn Village (312 Gartside) on June 1, 1970, which had been vacated on March 16, 1970.
C. One Charles Huck, a white male, applied on February 8, 1971, for a 2-bedroom unit and on June 8, 1971, was leased a unit in totally-white McCaffery Village (1002 Hardwick) which had been vacated on May 21, 1971. In the period from February 8, 1971 to June 8, 1971 a 2-bedroom unit in totally-Negro Ruth L. Bennett Homes (1118 W. Norris) had been vacated *93 on May 11, 1971, and was leased on June 9, 1971, to one Brenda Bradley, a Negro female, who applied on April 12, 1971, more than two months after the date of the aforesaid Huck's application.
D. One Charles Rothwell, a white male, applied for a 2-bedroom unit on January 12, 1971, and on April 30, 1971, was leased a unit in totally-white McCaffery Village (1207 Ganster) when on March 18, 1971, such a unit had become vacant in totally-Negro Ruth L. Bennett Homes (926 Stovall) and which, on April 5, 1971, was leased to Victoria Oliver, a Negro female, who had applied on March 17, 1971, over two months after the date of Rothwell's application.
8. Although burned-out families were to be accorded priority, Respondent, disregarding such priority, placed white applicants in a totally-white project and Negro applicants in a totally-Negro or substantially Negro project, to-wit:
A. One Adele Lewis, a Negro female, applied on February 16, 1971, for a 2-bedroom unit and was granted a burned-out priority. She was leased a unit in totally-Negro Ruth L. Bennett Homes (1316 W. Norris) on February 22, 1971, when, on February 18, 1971, such a unit in totally-white McCaffery Village (1200 Pulaski), vacant since January 30, 1971, was leased to one Sigola, a white female, who had applied on February 11, 1971, notwithstanding that the aforesaid Sigola did not have the aforesaid Lewis's priority.
B. One Althea Nickens, a Negro female, applied on June 30, 1970, for a 2-bedroom unit and was granted a burned-out priority. She was leased a unit in substantially-Negro William Penn Village (404 Ayars) on July 1, 1970, when, on July 7, 1970, such a unit in totally-white McCaffery Village (1306 Pulaski), vacant since June 19, 1970, was leased to one Barbara Hickey, a white female, who had no priority.
*94 9. As a result of the aforesaid practices the racial compositions of Respondent's aforesaid public housing projects were and are segregated by the race of the tenants thereof.
10. The maintaining of the aforesaid practices by Respondent has increased the racial segregation of the public schools of the City of Chester. Of 3,000 students in the four Chester Public Housing units, approximately 2,700 to 2,800 attend Chester Public Schools. If the aforesaid four Public Housing units were racially-balanced, the Chester School District plan for racially-balancing its Public Schools would have been redesigned so as to reduce the need and cost of busing Chester School District students.

APPENDIX B

CONCLUSIONS OF LAW
1. At all times herein mentioned Respondent, an Authority of the Commonwealth of Pennsylvania, maintained and continues to maintain the public housing projects, as aforesaid, in Chester, Delaware County, Pa., under its supervision, direction and control.
2. At all times herein mentioned Complainant had and still has jurisdiction over the subject matter of these proceedings and over Respondent.
3. Because of its tenant selection and assignment procedures Respondent has maintained and continues to maintain public housing projects under its supervision, direction and control that are segregated by the race of the tenants thereof, an unlawful discriminatory practice in violation of Section 5(h)(1) of the Act of October 27, 1955, P.L. 744, as amended, known as the Pennsylvania Human Relations Act.
4. Such aforesaid unlawful discriminatory practice by Respondent aids and abets racial segregation in the public schools of the City of Chester and is an unlawful *95 discriminatory practice in violation of Section 5(e) of the aforesaid Act.
5. The Complaint, as amended in the public hearing herein, was properly made and executed in accordance with Section 9 of the Pennsylvania Human Relations Act.
IT IS, therefore, recommended that the Commission enter an Order against Respondent requiring it to cease and desist from employing its present tenant selection and assignment procedures and to take affirmative action to eliminate its unlawful discriminatory practices.

APPENDIX C

FINAL ORDER
AND NOW, this 24th day of April, 1972, upon consideration of the foregoing Findings of Fact, Conclusions of Law, Commission's Decision and pursuant to Section 9 of the Pennsylvania Human Relations Act it is hereby

ORDERED:
That Respondent Chester Housing Authority, its agents, servants, employees and each of their respective successors:
1. Shall cease and desist from employing its present tenant selection and assignment procedures.
2. Shall cease and desist from renting housing accommodations in McCaffery Village to white tenant families until the racial composition of said project reflects the ratio of Negro to white tenant families in all public housing projects under Respondent's supervision, direction and control.
3. Shall cease and desist from renting housing accommodations in Lamokin Village, William Penn Village and Ruth L. Bennett Homes to Negro tenant families until the racial composition of each of said projects *96 reflects the ratio of white to Negro tenant families in all public housing projects under Respondent's supervision, direction and control.
4. Shall develop and submit to the Pennsylvania Human Relations Commission (at its Regional Office, Room 101, State Office Building, Broad and Spring Garden Streets, Philadelphia, Pennsylvania) for its approval, within 60 days of the effective date of this Order, an affirmative action program designed to achieve in Respondent's public housing projects the racial composition as set forth in Paragraphs 2 and 3 above, and upon obtaining said approval, forthwith to effectuate said program. Said plan shall include, but not be limited to, preoccupancy and post-occupancy counseling and the establishment of tenant councils.
5. Shall, in writing, inform all applicants and all present tenants of this Final Order and the content thereof.
6. Shall, beginning with the effective date of this Order, submit written offers to rent accommodations in its public housing projects to all applicants and require all replies thereto to be in writing, maintaining a permanent record of such offers and replies in its files.
7. Shall, from the effective date of this Order, utilize the services of the intergroup specialist of the Equal Opportunity Staff of the U.S. Department of Housing and Urban Development and the consultative services of the Pennsylvania Human Relations Commission.
8. Shall report to the Pennsylvania Human Relations Commission at its Regional Office as above set forth, beginning one month from the effective date of this Order, and monthly thereafter until such time as the racial composition in each project, as set forth in items 2 and 3 above, is achieved. Such report to contain information regarding the racial composition of each of its housing projects, as well as a list of all applicants, *97 transfers, assignment and re-assignments of all units in all said projects under its supervision, direction and control by racial identification and reflecting the ratio of Negro and white tenant families as set forth in Paragraphs 2 and 3 above, family size and size of unit requested and assigned, list of vacancies in each project and, thereafter, shall for a further period of two years, make such reports quarter-annually.
9. Shall, within 90 days of the effective date of this Order, establish objective written standards for the approval of applicants and assignment of units, copies of said standards to be submitted to the Pennsylvania Human Relations Commission (as above set forth) for its approval.
10. Shall meet with the Chester School District for discussion and drafting of a plan for a priority selection system for the placement of tenants with school-age children in Respondent's housing projects which placement will facilitate the desegregation of the schools of Chester School District and which shall be made to the Pennsylvania Human Relations Commission (as approval set forth), within 180 days of the effective date of this Order, for its approval, whereupon same shall be forthwith effectuated.
NOTES
[1] An appellate court is empowered to set aside or modify the Commission's adjudication when, inter alia, the findings of fact supporting the adjudication are "not supported by substantial evidence." Administrative Agency Law, Act of June 4, 1945, P.L. 1388, § 44, 71 P.S. § 1710.44 (1962). See Pennsylvania Human Relations Comm'n v. Chester School Dist., 427 Pa. 157, 181, 233 A.2d 290, 302-03 (1967).
[2] Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp. 1974).
[3] Act of October 27, 1955, P.L. 744, § 5(h), as amended, 43 P.S. § 955(h) (Supp. 1974).
[4] Section 5(e) makes it an unlawful discriminatory practice "[f]or any person . . . to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be unlawful discriminatory practice." 43 P.S. § 955(e) (1964).
[5] 43 P.S. § 959 (Supp. 1974). In compliance with the statutory directive, the Commission sent a letter together with its complaint to the chairman of the Authority, notifying him of the pending public hearing.

No challenge before either the Commission, the Commonwealth Court, or this Court has been made by the Authority to the procedure used by the Commission.
[6] For the racial composition of the four projects, see text accompanying note 14 infra.
[7] The complete findings of fact of the Commission are set out in Appendix A.
[8] See Appendix B.
[9] See text accompanying note 30 infra.
[10] See Appendix C.
[11] The Commonwealth Court also concluded: "[S]ufficient competent evidence was adduced to sustain the Commission's findings that particular tenants, both black and white, were refused housing due to racial considerations because [the Authority] had failed to offer available space, regardless of location, to a top priority tenant when it should have done so, regardless of race considerations." 9 Pa. Commonwealth Ct. at 424, 305 A.2d at 756 (emphasis deleted).
[12] By not taking an appeal from the order of the Commonwealth Court, the Authority is precluded from raising issues decided adversely to it by that court. Pennsylvania Human Relations Comm'n v. Alto-Reste Park Cemetery Ass'n, 453 Pa. 124, 128-29 n.5, 306 A.2d 881, 884 n.5 (1973). See also Cash's Appeal, 1 Pa. 166 (1845).
[13] The opinion of the Commonwealth Court is less than clear on this score, and it arguably supports another interpretation. The concern in that court perhaps was that the Commission had not established that racial discrimination proved by the Commission was in any way a cause of the de facto segregation of Chester's housing projects. If this is the correct interpretation, we find it somewhat incredible. The Commonwealth Court agreed that sufficient evidence showed "that certain tenants had been routed through [the Authority's] tenant placement procedure into projects whose tenant majority (usually entirety) corresponded to the tenant's race." 9 Pa. Commonwealth Ct. at 424, 305 A.2d at 755. Human experience and common sense dictate that when a landlord routes blacks into all-black projects and whites into all-white projects, the result is racial segregation.
[14] See Balsbaugh v. Rowland, 447 Pa. 423, 434-35 n.6, 290 A.2d 85, 91 n.6 (1972); Pennsylvania Human Relations Comm'n v. Chester School Dist., 427 Pa. 157, 158-59 n.1, 233 A.2d 290, 291 n.1 (1967).

In our view, racial imbalance means substantial statistical disparity.
[15] In its brief to this Court, the Authority concedes that the present racial imbalance in the four projects was purposefully caused. "The obviously imbalanced patterns of occupancy and site selection were brought about in large measure through the conscious design of the Federal and State governments. The result has been that various projects historically have been identified as Black or White. The Federal and State governments were knowing and willing partners in pursuing a policy which created the imbalance from 1938 until 1968." Brief for Appellee at 13.

The Authority tries to absolve itself from responsibility to end the admitted segregation by arguing that other organs of government, not it, were responsible. We do not address the question to what extent one agency of the state is responsible to undo the unlawful acts of another, because we rest our decision on the existence of de facto segregation. Cf. Banks v. Perk, 341 F. Supp. 1175, 1184 (N.D. Ohio 1972). But cf. Mayor v. Educational Equality League, 415 U.S. 605, 622-3, 94 S. Ct. 1323, 1334 (1974); Spomer v. Littleton, 414 U.S. 514, 520-23, 94 S. Ct. 685, 689-90 (1974).
[16] Brown v. Board of Educ., 347 U.S. 483, 74 S. Ct. 686 (1954).
[17] Other jurisdictions have upheld policies designed to eradicate de facto segregation in public schools. See, e.g., Guida v. Board of Educ., 26 Conn. Sup. 121, 213 A.2d 843 (Super Ct. 1965); Booker v. Board of Educ., 45 N.J. 161, 212 A.2d 1 (1965); Morean v. Board of Educ., 42 N.J. 237, 200 A.2d 97 (1964); Addabbo v. Donovan, 16 N.Y.2d 619, 209 N.E.2d 112, 261 N.Y.S.2d 68, cert. denied, 382 U.S. 905, 86 S. Ct. 241 (1965); Vetere v. Allen, 15 N.Y.2d 259, 206 N.E.2d 174, 258 N.Y.S.2d 77, cert. denied, 382 U.S. 825, 86 S. Ct. 60 (1965); State ex rel. Citizens Against Mandatory Bussing v. Brooks, 80 Wash.2d 121, 492 P.2d 536 (1972).

Similarly, federal courts have approved affirmative action by school boards designed to achieve integration. E.g., Deal v. Cincinnati Bd. of Educ., 369 F.2d 55, 61 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S. Ct. 39 (1967) (dictum); Wanner v. County Bd., 357 F.2d 452 (4th Cir. 1966); Springfield School Comm. v. Barksdale, 348 F.2d 261 (1st Cir. 1965); Norwalk CORE v. Board of Educ., 298 F. Supp. 213 (D. Conn. 1969); Offermann v. Nitkowski, 248 F. Supp. 129 (W.D.N.Y. 1965), aff'd, 378 F.2d 22 (2d Cir. 1967); Hobson v. Hansen, 269 F. Supp. 401 (D.D.C. 1967), aff'd sub nom., Smuck v. Hobson, 408 F.2d 175 (D.C. Cir. 1969) (en banc). Cf. Lee v. Nyquist, 318 F. Supp. 710 (W.D.N.Y. 1970), aff'd, 402 U.S. 935, 91 S. Ct. 1618 (1971). See also Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S. Ct. 2686 (1973); Brown v. Board of Educ., 349 U.S. 294, 75 S. Ct. 753 (1955).
[18] Cf. Hernandez v. Texas, 347 U.S. 475, 74 S. Ct. 667 (1954). See also United States v. Texas Educ. Agency, 467 F.2d 848, 862 n.19 (5th Cir. 1972).
[19] See, e.g., Otero v. New York Housing Authority, 484 F.2d 1122 (2d Cir. 1973); Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971); Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970); Blackshear Residents Org. v. Housing Authority, 347 F. Supp. 1138 (W.D. Tex. 1971); Banks v. Perk, 341 F. Supp. 1175 (N.D. Ohio 1972); Mahaley v. Cuyahoga Metro. Housing Authority, 355 F. Supp. 1245, 1257 (N.D. Ohio 1973); Crow v. Brown, 332 F. Supp. 382 (N.D. Ga. 1971), aff'd, 457 F.2d 788 (5th Cir. 1972); Kennedy Park Homes Ass'n v. City of Lackawanna, 318 F. Supp. 669 (W.D.N.Y.), aff'd, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S. Ct. 1256 (1971); Hicks v. Weaver, 302 F. Supp. 619 (E.D. La. 1969); Dailey v. City of Lawton, 296 F. Supp. 266 (W.D. Okla. 1969), aff'd, 425 F.2d 1037 (10th Cir. 1970); Gautreaux v. Chicago Housing Authority, 265 F. Supp 582 (N.D. Ill. 1967) (ruling on motions and orders), 296 F. Supp. 907 (N.D. Ill. 1969) (memorandum opinion), 304 F. Supp. 736 (N.D. Ill.) (judgment order), aff'd, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S. Ct. 1378 (1971); El Cortez Heights Residents & Property Owners Ass'n v. Tucson Housing Authority, 10 Ariz. App. 132, 457 P.2d 294 (1969); cf. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S. Ct. 364 (1972) (standing). See generally Ackerman, Integration for Subsidized Housing and the Question of Racial Occupancy Controls, 26 Stan. L. Rev. 245 (1974); Comment, Toward Improved Housing Opportunities: A New Direction for Zoning Law, 121 U. Pa. L. Rev. 330 (1972).
[20] The court supported its decision by reference to the much-commented-on "tipping point" phenomenon. "This gradual tendency of integrated areas to become more and more Negro is accentuated by the popular belief  often transmitted into action  that the rate at which white families move out rises with the percentage of Negroes in the area, and, more important, that there exists a `tipping point'  a given percentage of Negroes, after which the departure of whites from the areas will be greatly accelerated." Kaplan, Equal Justice in an Unequal World  The Problem of Special Treatment, 61 Nw. U.L. Rev. 363, 390 (1966) (quoted in Otero v. New York Housing Authority, 484 F.2d 1122, 1135 (2d Cir. 1973). See also Gautreaux v. Chicago Housing Authority, 296 F. Supp. 907 (N.D. Ill. 1969) (memorandum opinion), 304 F. Supp. 736 (N.D. Ill.) (judgment order), aff'd, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S. Ct. 1378 (1971). See generally Ackerman, Integration for Subsidized Housing and the Question of Racial Occupancy Controls, 26 Stan. L. Rev. 245, 251-70 (1974); Note, 85 Harv. L. Rev. 870, 875-76 (1972).
[21] Otero was decided in two parts at the trial level, 354 F. Supp. 941 (S.D.N.Y. 1973) (preliminary injunction granted), and 344 F. Supp. 737 (S.D.N.Y. 1972) (order).
[22] Judge MANSFIELD, writing for the Second Circuit, analyzed the constitutional basis for the Authority's duty to integrate in this fashion. "We agree with the parties and with the district court that the Authority is under an obligation to act affirmatively to achieve integration in housing. The source of that duty is both constitutional and statutory. Various discriminatory housing practices have been outlawed by judicial decree as violative of the Equal Protection Clause. An authority may not, for instance, select sites for projects which will be occupied by non-whites only in areas already heavily concentrated with a high proportion of non-whites. Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970), noted in 85 Harv. L.Rev. 870 (1972). A tenant assignment policy which assigns persons to a particular project because of the concentration of persons of his own race already residing at the project has been prohibited. Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907, 304 F.Supp. 736 (judgment order) (N.D.Ill. 1969), aff'd, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S. Ct. 1378, 28 L.Ed.2d 661 (1971). An authority is barred from using assignment methods which seek to exclude, or have the evident effect of excluding, persons of minority races from residing in predominantly white areas or of restricting non-whites to areas already concentrated by non-white residents. Crow v. Brown, 332 F. Supp. 382 (N.D.Ga. 1971), aff'd, 457 F.2d 788 (5th Cir. 1972). Not only may such practices be enjoined, but affirmative action to erase the effects of past discrimination and desegregate housing patterns may be ordered." Otero v. New York Housing Authority, 484 F.2d 1122, 1133 (2d Cir. 1973).
[23] The sole case cited affirmatively by the Authority, Blackshear Residents Org. v. Housing Authority, 347 F. Supp. 1138 (W.D. Tex. 1971), is directly contrary to its position. There, plaintiffs sought an order compelling the housing authority to adopt an affirmative action plan to desegregate racially-imbalanced housing projects. The court's response is well-considered and apt. "In justification of the relief sought, plaintiffs analogize the present posture of the Housing Authority to that of a local school board faced with the vestiges of a formerly segregated school system. Upon the authority of Green v. County School Board, 391 U.S. 430, 88 S. Ct. 1689, 20 L.Ed.2d 716 (1968), they contend that the Housing Authority is `clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch,' 391 U.S. at 437-438, 88 S. Ct. at 1694, and cite subsequent Fifth Circuit school desegregation cases in support of their proposal for a desegregation plan to be implemented under the continuing supervision of the Court. The comparison appears in many respects to be quite accurate." Id. at 1145. The relief requested was denied, however, for two reasons. First, the court found that the housing authority faithfully adhered to HUD tenant selection procedures. Second, the authority had officially declared that it would disperse future housing projects outside of areas exclusively populated by minority groups. Neither factor appears instantly. The Commonwealth Court concluded (and the Authority is bound by this conclusion because it took no appeal, see note 12 supra) that the Authority had not in fact complied with HUD regulations. And the record contains no official commitment by the authority to disperse housing projects.
[24] See also Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849 (1971). There, the United States Supreme Court under the authority of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2 (1974), invalidated the requirements of standardized general intelligence tests or high school education for employment, where the requirements bore no relation to the jobs sought, the jobs were formerly held only by whites, and the effect of the tests was to disadvantage minority groups. "[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as `built-in headwings' for minority groups and are unrelated to measuring job capability." Id. at 432, 91 S. Ct. at 854. See also Hawkins v. Town of Shaw, 461 F.2d 1171 (5th Cir. 1972) (en banc) (per curiam). For an exhaustive treatment on the relationship between discriminatory motive and proof of discrimination, see United States v. Texas Educ. Agency, 467 F.2d 848, 864-65 n.25 (5th Cir. 1972) (en banc).

In United States v. Medical Society, 298 F.Supp. 145 (D.S.C. 1969), the United States Attorney General sought to restrain a hospital from operating on a racially discriminatory basis. There was no finding that a black had ever been refused admission to the hospital. The court nonetheless held that where the hospital's "course of conduct has predictably resulted in practically no Negroes being patients at" the hospital, id. at 152, a Civil Rights Act violation had been made out. See 42 U.S.C.A. § 2000a-5(a) (1974).
[25] Accord, United States v. Local 46, Wood Lathers, 471 F.2d 408, 414 n.11 (2d Cir.), cert. denied, 412 U.S. 939, 93 S. Ct. 2773 (1973); United States v. Chesapeake & O. Ry., 471 F.2d 582, 586 (4th Cir. 1972), cert. denied, 411 U.S. 939, 93 S. Ct. 1893 (1973); Rowe v. General Motors Corp., 457 F.2d 348, 355 (5th Cir. 1972); Local 189, Papermakers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S. Ct. 926 (1970); United States v. N.L. Indus., Inc., 479 F.2d 354 (8th Cir. 1973); United States v. St. Louis-San Francisco Ry., 464 F.2d 301 (8th Cir. 1972); United States v. Local 86, Ironworkers, 443 F.2d 544, 551 (9th Cir.), cert. denied, 404 U.S. 984, 92 S. Ct. 447 (1971); United States v. Local 73, Plumbers, 314 F.Supp. 160 (S.D. Ind. 1969); Lea v. Cone Mills Corp., 301 F.Supp. 97, 102 (M.D.N.C. 1969), modified, 438 F.2d 86 (4th Cir. 1971); Dobbins v. Local 212, Electrical Workers, 292 F. Supp. 413 (S.D. Ohio 1968).
[26] Accord, Turner v. Fouche, 396 U.S. 346, 360, 90 S. Ct. 532, 540 (1970) (grand jury and school board selection); United States v. Board of Educ., 396 F.2d 44, 46 (5th Cir. 1968); Armstead v. Starkville Municipal Separate School Dist., 325 F.Supp. 560, 569 (N.D. Miss. 1971), modified, 461 F.2d 276 (5th Cir. 1972). See also Local 67, Iron Workers v. Hart, 191 N.W.2d 758, 769-70 (Iowa 1971).
[27] Another variation of this argument advanced by the Authority is that its compliance with the Commission order will result in substantial vacancies for considerable durations in the four projects. At this point, suffice it to say that the record is utterly barren of any indication that this will be the case.
[28] In United States v. Jefferson County Bd. of Educ., 417 F.2d 834 (5th Cir. 1969), a school desegregation case, the Court of Appeals for the Fifth Circuit stated: "There was testimony that white students would not attend formerly Negro schools. This is not a legal argument." Id. at 837 n.2. See also Stell v. Savannah-Chatham County Bd. of Educ., 333 F.2d 55, 61 (5th Cir.), cert. denied, 379 U.S. 933, 85 S. Ct. 332 (1964).
[29] The Director of Assisted Programs at HUD's Philadelphia Regional Office (covering Chester) testified at the public hearing and described the circumstances relating to the Authority's tenant selection procedure in the following fashion. In 1968 HUD required the Authority to adopt a nondiscriminatory tenant selection procedure; the choice was between a Plan A and a Plan B. Plan A contemplated that a prospective tenant would be given a single offer of housing and if he declined, would go to the bottom of the list. Plan B allowed a housing authority to extend up to three offers of housing before a refusal would require the prospective tenant to be given lowest priority. Offers, pursuant to Plan B, were made on the basis of location, not projects. In other words if two (or more) projects were physically proximate, an offer at either would be considered a single offer for both. The Authority chose Plan B; Lamokin and Ruth Bennett are defined as a single location.
[30] The Legislature as part of its findings for the Human Relations Act explicitly acknowledged the connection between racial discrimination in housing and segregated schools. "The denial of equal . . . housing . . . opportunities because of [racial] discrimination. . . compels many individuals to live in dwellings which are substandard, unhealthful and overcrowded, resulting in racial segregation in public schools . . . ." 43 P.S. § 952(a) (Supp. 1974).
[31] For the text of paragraphs two, three, four, eight, and ten, see Appendix C.
[32] Because the Commission's order seeks to make the racial composition in each housing project correspond to the ratio of whites to blacks for all projects administered by the Authority, it does not appear that either blacks or whites as groups will be favored or disadvantaged in their quest for public housing, to any greater extent than they are presently.
[33] We note there is nothing in the record or in the Commission's order that indicates tenants who currently reside in the four projects would be assigned to another project on anything but a voluntary basis.
[34] We reiterate our specific holding in Balsbaugh v. Rowland, 447 Pa. 423, 290 A.2d 85 (1972), that racial consciousness is appropriate in fashioning a remedy once unlawful discrimination has been found to exist. "`Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy.'" Id. at 437-38, 290 A.2d at 93 (quoting North Carolina Bd. of Educ. v. Swann, 402 U.S. 43, 46, 91 S. Ct. 1284, 1286 (1971)). See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S. Ct. 1267, 1276 (1971); United States v. Montgomery County Bd. of Educ., 395 U.S. 225, 234, 89 S. Ct. 1670, 1674-75 (1969); Coppedge v. Franklin County Bd. of Educ., 394 F.2d 410, 412 & n.2 (4th Cir. 1968). In Louisiana v. United States, 380 U.S. 145, 85 S. Ct. 817 (1965), the Supreme Court stated: "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Id. at 154, 85 S. Ct. at 822. Cf. DeFunis v. Odegaard, 82 Wash. 2d 11, 507 P.2d 1169 (1973), vacated as moot and remanded, 416 U.S. 312 94 S. Ct. 1704 (1974); San Franscisco Unified School Dist. v. Johnson, 3 Cal. 3d 937, 948-51, 479 P.2d 669, 675-77, 92 Cal. Rptr. 309, 315-17, cert. denied, 401 U.S. 1012, 91 S. Ct. 1266 (1971).